**James A. PAYNES**

v.

**Dan Dee LEE and John Doe.**

**Civ. A. No. 3071.**

United States District Court,
M. D. Louisiana.

Aug. 28, 1973.

Johnnie A. Jones, Baton Rouge, La., for plaintiff.

John F. Rau, Jr., Harvey, La., for defendant, Dan DeLee.

**E. GORDON WEST, District Judge:**

This suit has its genesis in an attempt by the plaintiff, James A. Paynes, to register to vote on October 17, 1963. After the suit was filed, this Court granted defendant's motion to dismiss for lack of jurisdiction. James A. Paynes v. Dan Dee Lee and John Doe, 239 F.Supp. 1019 (D.C.1965). Thereafter the Fifth Circuit Court of Appeals found jurisdiction to be present, though not pleaded, under Title 42, U.S.C. § 1985(3), and remanded it for trial on the merits. 377 F.2d 61 (5 Cir. 1967). Now, after trial on the merits, the Court makes the following findings and conclusions.

Paynes, a Negro, was a resident of West Feliciana Parish where he rented some 40 acres of farmland from the defendant, Dan DeLee, for an annual rental price of $125. He had lived on the place for approximately seven or eight years. At that time there were few, if any, Negroes registered to vote in West Feliciana Parish, and efforts were being made by various organizations to encourage Negroes to vote. Plaintiff's version of events is essentially as follows:

On Thursday, October 17, 1963, he, and a friend, Johnnie Hamilton, went to the Town of St. Francisville, Louisiana, to register to vote. When he arrived there he was cursed and threatened by two white men whose names were unknown to him, and he was unable to register to vote that day. He did not see the defendant at the courthouse. As far as he knows, only one Negro was permitted to register that day. The white men who accosted him said that they were taking his picture and that they would "get him" that night. He went home, loaded a pistol which he placed under his bed, and retired for the night. He was awakened some time between 11:00 p.m. and midnight when he heard a voice, which he recognized as the voice of his landlord, the defendant, Mr. Dan DeLee, calling for him to come out. He put on his shoes and clothes, got his pistol, and went outdoors. When he got outside he saw an automobile with its doors open and its lights on. A "big guy" got out of the car and hit him in the face with the butt of a shotgun and another white man pointed a shotgun at his feet. He did not recognize these two men but he was positive that the defendant, Mr. DeLee, was seated in the rear seat of the automobile. Mr. DeLee spoke to him and asked him why he tried to register to vote, and why he wanted to "mix with white folks." He was then warned to stay at his house, and if he did not they would return and kill him and burn his house down. They then fired a shot between his feet and one into his house, took his pistol from him, and warned him not to get another one. The next day he stayed on his place, and the following day he and Hamilton went to the grist mill where they told some friends what happened.

They called the Sheriff but he simply paid no attention to their complaint. Following that, the plaintiff went to see a Dr. Tyson in Plaquemine, Louisiana, who is a medical doctor, and who was active in the civil rights movement. That is when the incident received publicity and came to the attention of the United States Department of Justice. When the plaintiff returned to his home on October 21, 1963, he found 25 spent pistol cartridges and many spent shotgun shells in the yard around his house. His animals, including his hogs and cows, had all been turned loose. He remained on his farm until November 14, 1963, when he and his family left, never to return. His version of what happened on the night of October 17, 1963, is corroborated by the testimony of his wife and older son and is partially corroborated by his daughter and younger son, all of whom were present at the time here involved. His wife, Rosa Paynes, and his son, James A. Paynes, Jr., testified that they positively saw and identified the defendant in the automobile that night, and that they are positive that it was the defendant who called the plaintiff out of the house. The other son, Albert Paynes, and the daughter, Ora Lee Paynes, testified that they did not actually see any of the men that came to the house on the night of October 17, but that they heard the shots fired.

Plaintiff's friend, Johnnie Hamilton, who is 75 years of age, has lived on the defendant's place all of his life. He completely corroborates plaintiff's version of what happened at the courthouse on October 17. He testified that he, the plaintiff, and a group of Negroes went to town in a bus to register to vote, and were threatened by white men at the courthouse, and were never able to register. He did not see the defendant at the courthouse. He testified that that night the defendant and two other white men came to his house and told him that had no right to try to register to vote and

that he was "going to die tonight." This was at about 11:00 p.m. on the night of October 17, 1963. He said that he was positive that the man who did the talking to him was his landlord, the defendant, and that the other two men had shotguns.

■■ The defendant's story is diametrically opposed to that of the plaintiff. He testified that he "pulled corn" on the day of October 17, 1963, and that he did not leave his home that day. He testified that he went to bed when his work was finished around 8:00 or 8:30 that night. He swears that he did not leave the house again that night. He testified that on Friday, October 18, 1963, he left for Shreveport, Louisiana, at around 9:30 p.m. He vehemently denies that he went either to plaintiff's house or to Johnnie Hamilton's house on October 17, or at any other time involved in this litigation. He admits that when his deposition was taken on December 7, 1964, he refused, on advice of counsel, to answer any questions concerning his whereabouts on October 17, 1963. He stated " * * * I was advised not to tell nobody nothing, by my attorneys." He was then asked why, if he had not gone to the plaintiff's house that night, he did not say so. His answer was "I was advised by my attorney, Van Buskirk, not to never say nothing." While ordinarily a person is not to be penalized for invoking this constitutional protection, nevertheless, the Fifth Amendment does not guarantee that a person who invokes it will not be subject to any unfavorable inference. 98 C.J.S. Witnesses § 455.

"So, while the claim of privilege may not be used against defendant in a subsequent criminal prosecution, an inference that his testimony would have been unfavorable to him is available to his opponent in a civil cause in which defendant pleads the privilege." At p. 307.

But these refusals of the defendant to answer questions in December of 1964 must be viewed in light of the circumstances existing at that time. The racial climate in this area was extremely volatile. The Criminal Division of the United States Department of Justice was investigating any incident of racial conflict brought to its attention, and it seemed that just about everyone, particularly in the rural areas of the state, was considered suspect. There were stories appearing in the press indicating that criminal charges might grow out of the incidents alleged to have occurred on October 17, 1963, and federal agents had attempted to interview the defendant along with other residents of the area. It was in this context that defendant's attorney advised him to answer no questions without his, the attorney's, approval. Certainly no inference adverse to the defendant should be drawn from his having followed this advice.

The defendant's testimony that he did not leave his house after 8:30 p.m. on October 17, 1963, is corroborated by very positive testimony of the defendant's wife and son. Both of these witnesses testified that it would not have been possible for the defendant to have left the house without them knowing it, and they both affirmatively swear that of their own knowledge the defendant was in bed in his home from 8:30 p.m. on October 17, 1963, until around 6:00 a.m. the following day, October 18, 1963. The defendant testified that on Friday, October 18, 1963, he waited for his son to come home from playing football and then left with him and Mrs. DeLee for Shreveport, Louisiana, where his two sons were to participate in showing animals at the State Fair. He said he left for Shreveport at "about 9:30 or 10:00 o'clock." His son said that they left for Shreveport " * * * pretty late. I couldn't tell you—11:00 or 12:00—I couldn't tell you exactly, I don't know."

Now of course, if the incident about which the plaintiff complains had taken place on the night of Friday, October 18, 1963, instead of Thursday, October 17, 1963, it would have been possible for the defendant to have participated and still left for Shreveport by midnight or shortly before. But the plaintiff is adamant in his story that the incident complained of occurred on Thursday night, October 17, 1963.

Plaintiff insists that he spent that day, October 17, 1963, in the Town of St. Francisville, Louisiana, where he had gone to register to vote. But the records of the Princeville Canning Company of St. Francisville show that on that date the plaintiff delivered 12,050 pounds of potatoes, for which he was paid $241. Also, the plaintiff testifies that he left his home on Sunday, October 20, and went to see Dr. Tyson in Plaquemine, Louisiana, and then returned to his farm on Monday, October 21. The records of the canning company show that on the following day, October 22, he delivered 9,760 pounds of potatoes to the cannery. The question as to when the plaintiff had time between October 17 and October 22, in view of his testimony as to his whereabouts during that time, to harvest, crate and deliver these potatoes is somewhat perplexing. At any rate, the plaintiff is certain that the incident complained of occurred on October 17, 1963, at between 11:00 p.m. and 12:00 p.m.; he is certain that he saw the defendant at his home that night; he does not know the identity of the other two men; he does not know the name of the man who allegedly struck him; and he does not know who turned his animals loose nor exactly when they were turned loose. On the other hand, the defendant is positive that he was nowhere near the plaintiff's property at the time of this alleged incident; he is positive that he was in bed not later than 8:30 p.m. on the night of October 17, 1963, and that he did not leave his house at any time during that night; he is positive that he never, at any time, had any encounter

with the plaintiff, nor with Johnnie Hamilton, and that he did not participate in any way in the activities complained of. The plaintiff's testimony is corroborated by his wife and children, and the defendant's testimony is corroborated by his wife and son. Thus, everything is distinctly "black and white" with no "gray" area in between.

Someone is either lying or terribly mistaken. At the conclusion of this trial this Court ordered the record delivered to the United States Attorney with instructions to investigate and determine, if possible, against whom, if anyone, criminal charges for perjury should be brought. Apparently the investigation, if made, has been fruitless. Thus, this civil action must be decided on the record as it stands.

It is, of course, incumbent upon the plaintiff to prove each essential element of his case by a preponderance of the evidence if he is to prevail. I have searched this record with the proverbial "fine tooth comb" for some statement, contradiction, or other thing that would enable me to say that all of the evidence, taken as a whole, preponderates one way or the other. While there are bits of evidence that may be accorded conflicting interpretations, nevertheless, on balance, I am unable to conclude that there is a preponderance of evidence tipping the scale in either direction. I have re-lived this trial and have read and re-read the transcript in an attempt to assess the credibility of the witnesses. There is simply nothing that this Court can find that would justify it in attaching the "perjurer" label to either side. Thus, after applying the legal requirement that the plaintiff carries the burden of proving each essential element of his case by a preponderance of the evidence, I must come to the conclusion that the proofs in this case simply do not, as a matter of law, justify a finding of liability on the part of the defendant. Judgment will be entered accordingly in favor of the defendant, dismissing this suit at plaintiff's cost.