**Joe G. MOODY, Plaintiff-Appellant,**

v.

**BACHE & CO., INCORPORATED and Bob Peters, Defendants-Appellees.**

**No. 76–2266.**

United States Court of Appeals, Fifth Circuit.

March 30, 1978.

---

524

Patrick F. McGowan, Dallas, Tex., for plaintiff-appellant.

John Andrew Martin, Dallas, Tex., for defendants-appellees.

Before INGRAHAM, GEE and TJOF-LAT, Circuit Judges.

GEE, Circuit Judge:

The present case involves a broker's liability for a customer's losses on transactions in the commodities market. It raises issues of the applicability both of the securities acts of 1933 and 1934, 15 U.S.C. §§ 77a et seq. and 15 U.S.C. §§ 78a et seq., and of the Commodities Exchange Act, 7 U.S.C. §§ 1 et seq.

In March 1973, plaintiff Joe G. Moody opened a commodities account with defendant Bache & Co. on the urging of Bache's representative, Robert Peters. Peters told Moody that he would invest for Moody according to the recommendations of Bache's research department. In fact, however, Peters did not do this, or did not do so uniformly, but rather invested according to a

method of his own. He had considerable success during March and April, but in May this success soured dramatically. On May 2, Peters made on Moody's behalf the trades that ultimately led to this lawsuit: he "shorted" twenty contracts for September wheat. His trade on the "short" side reflected his hope that the price of wheat would decline; but instead, no doubt due to the market's reaction to the Soviet wheat deal, the price of wheat rose. Peters continued to keep Moody's account in the short position and did so for a time even after Bache's research analysts began to advise that short positions be "covered." When Moody's wheat position was liquidated on June 1, the account had suffered a net loss of over $86,000 due to the wheat trades. Coincidentally, Moody also suffered a net loss of over $5,000 in a Bache securities account due to trading in certain bonds. To recoup his losses, plaintiff brought this action under the securities acts and the Commodities Exchange Act, concentrating his arguments on section 10(b) of the 1934 Securities Exchange Act and Rule 10b–5 promulgated under that Act. According to this well-known rule (17 C.F.R. § 240.10b–5), it is unlawful for any person to make untrue statements or omissions of material fact in connection with the purchase or sale of any security.[1]

After trial, the jury answered several specific questions as to Peters' commodity trading in Moody's behalf; as will appear below, these findings are the basis of the present appeal. The jury also made several findings exonerating Bache and Peters with respect both to the bond transactions and to charges of malice. The district court held that the jury findings resolved all issues of liability in favor of defendants and awarded judgment accordingly. Plaintiff Moody now appeals.

■ Before reaching the substance of Moody's contentions on appeal, we must note some preliminary points. Courts have widely agreed that a particular commodities futures contract is not in itself a security under the securities acts. *SEC v. Continental Commodities Corp.,* 497 F.2d 516, 520 n. 9 (5th Cir. 1974), and cases cited therein; *cf. Booth v. Peavey Company Commodity Services,* 430 F.2d 132 (8th Cir. 1970), *but see Marshall v. Lamson Brothers & Co.,* 368 F.Supp. 486 (S.D.Iowa 1974). According to the definitions of these acts, the term "security" embraces investment contracts; and according to the Supreme Court in *SEC v. W. J. Howey Co.,* 328 U.S. 293, 298–99, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946), "an investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party."[2] In *SEC v. Koscot Interplanetary, Inc.,* 497 F.2d 473, 477 (5th Cir. 1974), this court noted that the *Howey* test "subsumes within it three elements: first the existence of an investment of money; second, that the scheme functions as a common enterprise; and third, that the profits of the enterprise are derived solely from the efforts of others." *Continental Commodities, supra* at 521, *cit-*

1. The rule provides:
§ 240.10b–5 Employment of manipulative and deceptive devices.
   It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
   (a) To employ any device, scheme, or artifice *to* defraud,
   (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
   (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

2. *Howey* refers to the 1933 Act and not the 1934 Act, but the definitional sections of these two Acts are substantially identical; in *Tcherepnin v. Knight,* 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967), the Supreme Court quoted *Howey* to define investment contracts under the 1934 Act.

ing *Koscot* at 477.[3] It has often been held that futures contracts fail to meet this test because, as Judge Rubin said in *McCurnin v. Kohlmeyer & Co.*, 340 F.Supp. 1338, 1341 (E.D.La.1972), *aff'd per curiam*, 477 F.2d 113 (5 Cir. 1973):

> A commodity future contract is no more or less than an option; the purchaser agrees to take delivery, or the seller agrees to make delivery, of a specified quantity of a specified commodity at a specified future time at a specified price. Unless the investor reverses his position timely by selling what he has bought or buying what he has sold, he must accept delivery of the commodity and pay the full purchase price as set by the contract (or deliver the commodity against the full payment, if he has sold). He is in no way investing his money in a common enterprise, nor is he led to expect profits solely from the efforts of any third party. The "enterprise" is an individual one. The expectation of profit arises solely from the speculative hope that the market price of the underlying commodity will vary in his favor, permitting purchase or sale at a profit.

*See Sinva Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 253 F.Supp. 359, 366–67 (S.D.N.Y.1966); *accord Continental Commodities Corp.*, *supra* at 520 n. 9, and cases cited therein. Hence the courts have generally rejected the "novel contention that the regulatory features of the securities acts be extended into the vast domain of the commodities markets." *Sinva, supra* at 365.

■ On the other hand, some courts, including this one, have recognized that discretionary accounts in commodities futures contracts—as opposed to the futures contracts themselves—may be "investment contracts" and thus "securities" for purposes of the securities acts. This is because such discretionary accounts may contain the *Howey* elements of investment, common enterprise, and dependence solely on the efforts of others. *Continental Commodities, supra.*[4] Plaintiff in the present case argues as if the commodities futures contracts themselves were securities. We reject this line of argument; if any "security" subject to the securities acts was involved in this case, it must be the Bache commodity account itself, on the theory that this was a discretionary account such as to be considered an "investment contract" and thus a security subject to the acts.[5] In answers to specific questions the jury found that plaintiff Moody gave Peters discretion to make the transactions in Moody's account and that the ill-starred May transactions were so made; but it also found that plaintiff authorized or consented to these transactions. Supposing that these findings are sufficient to render the commodities account a "discretionary account," we must still bear in mind that only the account itself—not the individual commodities futures traded—can be a "security" subject to the securities acts.

**3.** *United Housing Foundation v. Forman*, 421 U.S. 837, 852, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1975), adds with respect to the *Howey* test that "[t]he touchstone is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the *entrepreneurial* or *managerial* efforts of others." (emphasis added).

**4.** Some courts have rejected the idea that even discretionary accounts in commodities futures can meet the *Howey* test for investment contracts. *See, e. g., Milnarik v. M–S Commodities*, 457 F.2d 274 (7th Cir.), *cert. denied*, 409 U.S. 887, 93 S.Ct. 113, 34 L.Ed.2d 144 (1972).

**5.** In several cases of "churning" (i. e., excessive trading for the purpose of raising brokers' fees) where both securities and commodities were involved, some courts have held that a plaintiff

may recover under the securities acts if the transactions are a part of a single fraudulent scheme. *See Hecht v. Harris, Upham & Co.*, 430 F.2d 1202 (9th Cir. 1970); *Goodman v. Hentz & Co.*, 265 F.Supp. 440 (N.D.Ill.1967). Supposing that we were to accept this theory, it would be inapplicable to the case at bar. Although the original complaint included charges relating to losses on the trading of certain bonds, there is no indication that there was a "single fraudulent scheme" linking the transactions in the securities account to those in the commodities account. The chief losses and transactions complained of concern the commodities trading; plaintiff's argument on appeal focuses entirely on the commodities account transactions.

■ This analysis disposes of several portions of plaintiff's argument, namely those that seek to impose liability on Bache as a broker or dealer. Bache was of course a broker or dealer in commodities futures, but since these are not securities, Bache's brokerage activities in commodities futures do not in themselves entail liability under the securities acts. And with respect to the account itself—the only arguable "security" at issue—Bache was not a broker or dealer but was rather at most in the position of an issuer or seller.[6]

With the issues thus narrowed, we reach the main focus of plaintiff's argument. In the jury's answers to specific interrogatories about the commodities account, it found that Peters did represent that he would act in accordance with the Bache recommendations, that this representation was false and misleading, that Peters knew it to be so, that Moody relied on this representation in making his investment, and that the representation was "material" in the sense that a reasonable person would have regarded it as important and relied on it. However, the jury also found that the representation was not the cause of Moody's loss.

■ Plaintiff contends that the last of these findings is inconsistent with the previous findings, and he urges that causation follows as a matter of law where reliance and materiality are found. This contention relates to the requirements for a private cause of action under Rule 10b–5. That such a private cause of action exists is now "well established," *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 196, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), and this court recognized such a cause of action in *Hooper v. Mountain States Securities Corp.,* 282 F.2d 195 (5th Cir.), *cert. denied,* 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1960). But such an action is essentially a tort claim. *See Kardon v. National Gypsum Co.,* 69 F.Supp. 512 (E.D.Pa.1946). Thus, the private complainant must show not only a violation of the rule, i. e., an untrue statement or material omission in connection with the sale of a security, but must also show that the omission or untrue statement resulted in or caused the complainant's damage. *See Sargent v. Genesco, Inc.,* 492 F.2d 750, 759 (5th Cir. 1974). In some contexts, however, it has been held that where reliance and materiality—or even materiality alone—are shown, this is a sufficient showing of cause of harm, and no further proof of causation need be adduced. *E. g., Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 154, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); *Chasins v. Smith Barney & Co., Inc.,* 438 F.2d 1167 (2d Cir. 1970). In view of these cases, plaintiff argues that the jury's finding of "no causation" must have been based on an erroneous understanding of the showing of causation required by law, and hence that this finding should be disregarded.[7]

■ We disagree. We may observe at the outset that plaintiff made no objection to the separate jury question on causation. We observe further that the cases on which

---

**6.** Plaintiff's arguments with respect to Bache's brokerage duties rely chiefly on § 15(c)(1) of the 1934 Securities Exchange Act, 15 U.S.C. § 78*o*(c)(1), as applied under § 29(b) of the same act, 15 U.S.C. § 78cc(b). Plaintiff cites especially *Eastside Church of Christ v. National Plan, Inc.,* 391 F.2d 357 (5th Cir.), *cert. denied,* 393 U.S. 913, 89 S.Ct. 234, 21 L.Ed.2d 198 (1968), to argue that a contract made in violation of the brokerage requirements may be rescinded with no showing of a causal relationship between the violation and the harm to the complainant. In view of our position that Bache was not a broker with respect to the commodities account, we need not discuss this argument here, although we note that in this case, where plaintiff essentially asks for a remedy comparable to money damages, the argu-ment is highly questionable in light of the Supreme Court's discussion of § 29(b) in *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970).

**7.** Plaintiff makes a somewhat protracted argument relating to a distinction between "loss causation" and "transaction causation," saying that only the latter must be shown—that is, a complainant may recover if he shows that the misrepresentation caused him to enter the transaction in question and need not show any further cause of loss. We need not enter into this discussion, since our disposition of the case does not entail causation beyond what plaintiff refers to as "transaction causation."

plaintiff places greatest emphasis, *Affiliated Ute* and *Chasins, supra,* are both cases dealing primarily with nondisclosure of material fact rather than with misstatements. In the case of nondisclosure, it is particularly difficult to show a causal relationship to damage, but this is not necessarily true of actual misleading statements.[8] Finally, even in the nondisclosure cases, where a causal link between violation and harm is always most difficult to prove, a specific finding of nonreliance may suffice to overcome the materiality of the omission. *Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 482 F.2d 880 (5th Cir. 1973). By the same token, a specific finding of no causation may suffice to overcome findings of reliance and materiality. While reliance and materiality, or even materiality alone, may sometimes establish causation without any further showing, we cannot say that findings of materiality and reliance by law must negate a specific finding of no causation.

■ We are particularly persuaded of this view by a factor that the plaintiff's argument entirely overlooks: that is, the further jury finding that the plaintiff authorized or consented to the commodities transactions that ultimately proved so ill advised. The jury had before it evidence of frequent communication between plaintiff and Bache's representative Peters, including daily phone calls; it also had before it evidence that Peters explained his investment methods to plaintiff after the account had been opened. The jury may well have concluded that while Peters' misrepresentations as to following the Bache recommendations swayed the plaintiff to open the commodities account in the first place, by the time of the wheat futures purchase and subsequent loss, these misrepresentations were no longer matters of any consequence to either party. In somewhat similar circumstances, some courts in brokerage cases have held that when a complainant's close contact with a broker indicates knowledge or approval of the broker's transactions, the complainant is estopped from maintaining that the transactions were unsuited to his needs. *Hecht v. Harris, Upham & Co.,* 430 F.2d 1202, 1212 (9th Cir. 1970); *accord Ferguson v. Francis I. duPont,* 369 F.Supp. 1099 (N.D.Tex.1974); *see also Canizaro v. Kohlmeyer & Co.,* 370 F.Supp. 282 (E.D.La. 1974), *aff'd per curiam,* 512 F.2d 484 (5th Cir. 1975). For reasons stated earlier, the present case cannot be classified as a brokerage case, but we nevertheless regard the jury's finding of authorization or consent to be an important support in sustaining its finding of "no causation" over against the other findings of reliance and materiality.[9] Certainly the jury had evidence from which it could conclude that whatever reliance plaintiff placed on Peters' misrepresentations, by the time of the disputed transactions these misrepresentations were no longer material, and the effect of any reliance was rendered inconsequential by the plaintiff's own close involvement in the transactions to which he now so strenuously objects.

■ Plaintiff argues, finally, that section 4b of the Commodities Exchange Act, 7 U.S.C. § 6b, entitles him to relief comparable to that available in a private action for a securities violation under Rule 10b–5. This section of the Commodities Exchange Act states in part that it is unlawful for a

---

8. *See Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). Similar proof problems appeared in *Mills* itself. This case concerned misleading materials in a proxy solicitation, and it involved especially difficult proof problems in showing a causal link between the defective proxy materials and the shareholders' approval of a merger. Under these circumstances the Supreme Court held that the plaintiffs showed a sufficient causal relationship if they showed that the proxy solicitation itself, rather than the defect in the solicitation materials, was an essential link in the accomplishment of the transaction (i. e., the merger).

9. We find no conflict with *Colvin v. Dempsey-Tegeler & Co., Inc.,* 477 F.2d 1283 (5th Cir. 1973), in which the jury inconsistently found materiality, reliance and causation but no damage. Damage in that case was the necessary consequence of materiality, reliance and causation. For reasons stated above, we do not regard cause in this case to be the ineluctable consequence of reliance and materiality.

member of the contract market to cheat, defraud or willfully deceive any person in connection with any commodities sales contract.[10] However, the section and the Act generally make no explicit provision for a private right of action. This court has not ruled on the issue of whether the Act impliedly authorizes such private actions, although we note that several courts have ruled—with varying depths of consideration—that it does. *Case & Co. v. Board of Trade of City of Chicago*, 523 F.2d 355 (7th Cir. 1975); *Deaktor v. LD Schreiber & Co.,* 479 F.2d 529 (7th Cir.), *rev'd on other grounds,* 414 U.S. 113, 94 S.Ct. 466, 38 L.Ed.2d 344 (1973); *Booth v. Peavey, supra; Arnold v. Bache & Co., Inc.,* 377 F.Supp. 61 (M.D.Pa.1973); *McCurnin, supra; Goodman v. Hentz & Co.,* 265 F.Supp. 440 (N.D.Ill. 1967); *see also Gould v. Barnes Brokerage Co.,* 345 F.Supp. 294 (N.D.Tex.1972).

If such an action exists it is based on the principle that a federal statutory prohibition may create a private right of action where the complainant is a member of the class for whose especial benefit the statute was enacted, where such private actions are consistent with the legislative intent and underlying purpose, and where regulation of the activity is not so fundamentally a matter of state law that it would be inappropriate to recognize an implied right of action based entirely upon federal law. *See Piper v. Chris-Craft Industries, Inc.,* 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977); *Wilson v. First Houston Investment Corp.,* 566 F.2d 1235 (5th Cir. 1978). But any such private right of action under the Commodities Exchange Act would be in the nature

of a tort action, *see Goodman v. Hentz, supra;* like other tort actions it would require some showing of a causal link between the violation and the damage to the complainant. Here, as in the 10b–5 action, the jury's finding of no causation would preclude plaintiff's recovery, even on the supposition that section 4b does create a private right of action.[11]

Since plaintiff can recover neither under the securities acts nor under the Commodities Exchange Act—even assuming that the latter creates a private right of action—we affirm the judgment of the district court.

AFFIRMED.

---

10. The relevant portions of the statute are:

It shall be unlawful (1) for any member of a contract market, or for any correspondent, agent, or employee of any member, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce, made, or to be made, on or subject to the rules of any contract market, for or on behalf of any other person . . . ..

(A) to cheat or defraud or attempt to cheat or defraud such other person;

(B) willfully to make or cause to be made to such other person any false report or statement thereof, or willfully to enter

or cause to be entered for such person any false record thereof;

(C) willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any such order or contract or the disposition or execution of any such order or contract, or in regard to any act of agency performed with respect to such order or contract for such person . . . ..

11. We note that plaintiff does not claim any greater rights under § 4b than he would have had if commodities futures were regulated by Rule 10b–5 under the 1934 Securities Exchange Act.