**POPLAR GROVE PLANTING AND REFINING CO., INC.**

v.

**BACHE HALSEY STUART INC.**

**Civ. No. 77–83.**

United States District Court, M. D. Louisiana.

Feb. 12, 1979.

⟐➝30

John V. Parker, Sanders, Downing, Kean & Cazedessus, Baton Rouge, La., for plaintiff.

Phillip A. Wittmann, Susan R. Stockstill, Stone, Pigman, Walther, Wittmann & Hutchinson, New Orleans, La., for defendant.

E. GORDON WEST, District Judge:

In 1974, the plaintiff, Poplar Grove Planting and Refining Co., Inc. (hereinafter referred to as Poplar Grove), opened a sugar commodities trading account with Bache Halsey Stuart Inc. (hereinafter referred to as Bache), out of Bache's Houston office. In its first year in the commodities market, Poplar Grove lost approximately $220,000. The following year the account was transferred to Bache's New Orleans office, where it was assigned to Account Executive James Ghio, for handling. This apparently proved to be an advantageous decision, as Poplar Grove earned approximately $540,-000 in 1975. However, during the summer of 1976, alleged unauthorized trades began to appear in the account which caused large losses for Poplar Grove.

The first of these unauthorized trades occurred on July 8, 1976. Poplar Grove had authorized the purchase of 10 contracts of October sugar, but 30 were actually purchased for the account. These 20 extra contracts were eventually sold on September 15th. On July 9th, 5 unauthorized contracts of London sugar were purchased for the Poplar Grove account. These were transferred, also without authority, to the private account of Carter Wilkinson, Poplar Grove's representative and officer authoriz-

ed to deal in commodities. The third unauthorized trade occurred on July 30th, when Bache "sold short" 25 March sugar contracts and covered itself by purchasing 40 March sugar contracts three days later. The net result was that 15 extra, unauthorized contracts then existed in the account, which were ultimately sold on September 23, 1976. A fourth transaction, occurring on August 6th, was the "selling short" and subsequent cancellation of the sale of 15 contracts of September sugar which did not result in a loss to Poplar Grove. A fifth unauthorized transaction occurred on August 10th, when Bache "sold short" 20 September sugar contracts which were later offset by purchases one day later. On September 16th, the last unauthorized trade occurred when Bache sold 10 contracts of October sugar and corrected this mistake on September 21st with the purchase of a like number of contracts.

On two separate occasions Bache wrongfully credited funds wired to it from Poplar Grove to the private account of Carter Wilkinson. On August 3rd, a variation margin call went out to Poplar Grove for $57,000. Poplar Grove wired $57,000 to Bache through the Whitney National Bank in New Orleans, but Bache only credited $34,000 to the account of Poplar Grove, and credited the other $23,000 to Wilkinson's private account. On August 12th, a similar incident occurred when $12,100 of $62,205 sent by Poplar Grove in response to a margin call was wrongfully credited to Wilkinson's private account.

The testimony at the trial revealed that without exception, Poplar Grove notified James Ghio, either by telephone or in person, of the unauthorized nature of the trades and credits. Defendant contests the sufficiency of this notification. As a result of the actions of Bache and James Ghio, the plaintiff alleges a civil cause of action under the theories of implied civil remedies emanating from the Securities Act of 1933, 15 U.S.C. § 77a, et seq., the Securities Exchange Act of 1934, 15 U.S.C. § 78a, et seq., and the Commodities Exchange Act, 7 U.S.C. § 6b and § 6d; and Louisiana law of mandate, Civil Code Articles 3003 and 3010.

▮ The plaintiff urges that the actions of Ghio and Bache were violative of the Securities Act of 1933, 15 U.S.C. § 77a, et seq., and the Securities Exchange Act of 1934, 15 U.S.C. § 78a, et seq. As developed by prior jurisprudence, these claims are without merit. To be a violation of either Act the alleged transactions must first be shown to be "securities" as contemplated by the Acts. *SEC v. C. M. Joiner Leasing Corp.*, 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943); *Tcherepnin v. Knight*, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967); *McCurnin v. Kohlmeyer & Co.*, 340 F.Supp. 1338 (E.D.La.—1972). The definitions of "security" as set out in Section 2(1) of the Securities Act, 15 U.S.C. § 77b(1), and Section 3(a)(10) of the Securities Exchange Act, 15 U.S.C. § 78c(a)(10), are substantially the same. Neither definition makes any reference to a commodity futures contract nor does it contain "any term that can be fairly understood to embrace such a contract." *McCurnin*, supra, at 1340.

▮ The United States Supreme Court in *SEC v. C. M. Joiner Leasing Corp.*, supra, established the test of determining a "security":

"The test . . . is what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducement held out to the prospect." 64 S.Ct. at 124.

This was further refined in *Securities and Exchange Commission v. W. J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946):

"[A]n investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party . . ." 66 S.Ct. at 1103.

"The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." 66 S.Ct. at 1104.

A commodity contract, particularly one involving a non-discretionary account, is not a security. In the present case the only one with authority to trade in the account was Carter Wilkinson. James Ghio was only to act on the order of Wilkinson. The present situation does not fulfill the "common enterprise" requirement, nor is the expected gain "solely from the efforts of others." A similar conclusion has been reached in numerous other cases. See *McCurnin,* supra; *Moody v. Bache & Co., Inc.,* 570 F.2d 523 (CA 5—1978); *Arnold v. Bache & Co., Inc.,* 377 F.Supp. 61 (M.D.Penn.—1973); *Securities and Exchange Commission v. Continental Commodities Corp.,* 497 F.2d 516 (CA 5—1974); *Sinva, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.,* 253 F.Supp. 359 (S.D.N.Y.—1966); *Bromberg, Securities Law,* § 4.6 at p. 352 (1969). Therefore, this Court holds that the Securities Act of 1933, 15 U.S.C. § 77a, et seq., and the Securities Exchange Act of 1934, 15 U.S.C. § 78a, et seq., are inapplicable to this case. But plaintiff also invokes the Commodities Exchange Act, 7 U.S.C. § 6b and § 6d, as a basis for its claim. In pertinent part, that statute provides:

"It shall be unlawful (1) for any member of a contract market, or for any correspondent, agent, or employee of any member, . . . in connection with . . . any contract of sale of any commodity for future delivery . . .

(A) to cheat or defraud or attempt to cheat or defraud such other person;

(B) willfully to make or cause to be made to such other person any false report or statement thereof, or willfully to enter or cause to be entered for such person any false record thereof;

(C) willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any such order or contract or the disposition or execution of any such order or contract, or in regard to any act of agency performed with respect to such order or contract for such person; or

(D) to bucket such order, or to fill such order by offset against the order or orders of any other person, or willfully and knowingly and without the prior consent of such person to become the buyer in respect to any selling order of such person, or become the seller in respect to any buying order of such person."

The applicability of this statute depends upon the determination of two preliminary matters, i. e., is sugar a "commodity" within the meaning of the Act, and are the actions of Ghio attributable to Bache. We find no reported decisions dealing directly with the question of whether or not, under the Act, sugar is a commodity. Prior to the 1974 amendment to the Act, the term "commodity" was specifically defined by an exclusive listing of various products which did not include sugar. That section, 7 U.S.C. § 2, was amended in 1974 by adding the phrase: "and all other goods and articles, except onions, as provided in section 13–1 of this title, and all services, rights, and interests in which contracts for future delivery are presently or in the future dealt in . . ." Admittedly this phrase was put in to substantially enlarge the definition of commodities. Senate Report 93–1131, 74 U.S.Cong. and Admin.News, 1974, p. 5843 at p. 5870. We therefore hold that sugar is now a "commodity" under the Act.

■ The Court further concludes that under the provisions of 7 U.S.C. § 4, commonly known as the "Commodity Exchange Act," which provides:

"For the purpose of this Chapter the act, omission or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust as well as of such official, agent or other person,"

the actions of Ghio involved in these transactions must be attributable to his employer, Bache Halsey Stuart Inc.

■ Even though the Commodity Exchange Act does not specifically mention a civil remedy for violations of the standard of conduct set forth in Section 6b thereof,

such a remedy is implied by the nature and terms of the Act. Plaintiff alleges that it was defrauded while investing in commodities regulated by the Act. Thus it falls within the class of persons which Congress sought to protect. In the case of *Goodman v. H. Hentz & Co.,* 265 F.Supp. 440 (N.D.Ill. —1967), the Court said:

"Violation of the standard of conduct set out in Section 6b of the Commodity Exchange Act is a tort for which plaintiffs, as members of the class Congress sought to protect from the type of harm they allege here, have a federal civil remedy even in the absence of specific mention of a civil remedy in the Commodity Exchange Act." At 447.

There seems little doubt that Congress intended to create, at least by implication, a civil remedy in a case such as this. Initially the Act was passed to protect producers, consumers, and the exchanges. 1 *Bromberg, Security Law* § 4.6. However, the Senate Committee Report, 93–1131, 74 Cong. and Admin.News, p. 5843, dealing with the latest amendments to the Act notes that one of the purposes of the amendments is:

"to further the fundamental purposes of the Commodity Exchange Act in insuring fair practice and honest dealing on the commodity exchanges." At 5844.

It is thus quite clear that the proscription against fraudulent activities and deceptive trading in the commodities market is intended to protect those who buy and sell futures contracts through the commodity exchanges. This Court finds that the plaintiff falls within the class intended to be protected and that a private cause of action does exist in its favor for the damages it alleges to have sustained. Numerous other Courts have allowed such remedies in similar cases. See *Romnes v. Bache & Co., Inc.,* 439 F.Supp. 833 (W.D.Wisc.—1977); *Case & Co., Inc. v. Board of Trade of City of Chicago,* 523 F.2d 355 (CA 7—1975); *Deaktor v. L. S. Schreiber & Co.,* 479 F.2d 529 (CA 7—1973), reversed on other grounds, 411 U.S. 113, 94 S.Ct. 466, 38 L.Ed.2d 344 (1973); *Booth v. Peavey Co. Commodities Services,* 430 F.2d 132 (CA 8—1970);

*McCurnin,* supra; *Goodman v. Hentz & Co.,* supra; *1 Bromberg, Security Law,* § 4.6 (1971). While the Fifth Circuit has not specifically ruled on whether or not an implied cause of action is created by the statute, its language in *Moody v. Bache & Co., Inc.,* supra, strongly suggests that it would so hold in a case such as this. In *Moody* the Court said:

"If such an action exists it is based on the principle that a federal statutory prohibition may create a private right of action where the complainant is a member of the class for whose special benefit the statute was enacted, where such private actions are consistent with the legislative intent and underlying purpose, and where regulation of the activity is not so fundamentally a matter of state law that it would be inappropriate to recognize an implied right of action based entirely upon federal law." 570 F.2d at 529.

The Court went on to say:

". . . any such private right of action under the Commodities Exchange Act would be in the nature of a tort action . . . (that) would require some showing of a causal link between the violation and the damage to the complainant." At 529.

We therefore conclude that the plaintiff does have a tort claim against the defendant if it can show a causal link between the alleged violation and the damage complained of.

In determining whether the actions of Mr. Ghio violated the statute in such a way as to give rise to possible tort liability, some guidelines may be found by reference to the findings of the Administrative Law Judge in *Haltmier v. Commodity Futures Trading Commission,* 554 F.2d 556 (CA 2—1977), and *Silverman v. Commodity Futures Trading Commission,* 549 F.2d 28 (CA 7—1977). In *Silverman,* the petitioner was charged with making 23 unauthorized trades on the accounts of five customers. One of these customers gave the account executive the authority to deal in his account but was told expressly not to deal in eggs. The petition-

er did deal in eggs and the customer objected. Even after the customer objected the petitioner continued to deal in eggs eight times. In a situation very similar to the present case, the customer told the petitioner not to trade in his account without specific authorization. The petitioner dealt with his account, buying and selling, six times without the customer's knowledge. The Administrative Law Judge found such actions were willful violations of Section 4b of the Act, (7 U.S.C. § 6b), which makes it unlawful ". . . for any member of a contract market . . . or employee of any member . . . in connection with any order . . . to cheat or defraud or attempt to cheat or defraud such other person."

In *Haltmier v. Commodity Futures Trading Commission,* supra, the account executive had specific instructions that he was to deal only in soybean futures. He dealt repeatedly in other than soybean contracts while the customer was in Europe on business. As soon as the customer returned he objected to the non-soybean contracts, had them purged from his account and closed the account. The Administrative Law Judge found such actions violative of the Commodity Exchange Act, Section 4b. In affirming the Administrative Law Judge, the Court of Appeals said:

> "There is now no doubt that it is a violation of the Commodity Exchange Act for an account executive in the brokerage business intentionally to carry on trading transactions not authorized by his customers.
>
> .   .   .   .   .
>
> "This has been administratively held to cover deliberate, willful, unauthorized trading by a commodities broker for the account of his customer (see e. g. George Rex Andrews, 32 Agri.Dec. 553 (1973)), and we have no more reason to disagree with that reading than did the Seventh Circuit . . ." At 560.

The court went on to say that it is not important whether Haltmier had an evil motive or not or even any intent to injure his customer.

"It is enough that he acted deliberately, knowing that his acts were unauthorized and contrary to instructions. Such knowing, intentional conduct made his acts willful, and therefore his violations of the statutory prohibition against cheating or defrauding the customer were willful, in the accepted sense of infractions of this type." At 562.

The evidence in this case leads to the inevitable conclusion that Mr. Ghio did indeed violate Section 4(b), 7 U.S.C. § 6b, of the Act. The circumstantial evidence is overwhelming. In addition to that, Mr. Ghio himself testified that the numerous transactions complained of were unauthorized. Throughout his testimony he referred to the trades as "unauthorized" and responded to questions concerning the "unauthorized trades" without any objection from Bache's counsel. Numerous times throughout the trial and at his deposition Ghio asserted his Fifth Amendment right against self-incrimination, refusing to answer questions. Since few, if any, of the questions posed to Ghio were answered, this Court has no choice but to draw the inference from his refusal to testify that he was responsible for the unauthorized acts complained of. Such inference may be drawn in civil trials. *Paynes v. Lee,* 362 F.Supp. 797 (M.D.La.—1973); aff'd 487 F.2d 1307 (CA 5—1974); 98 C.J.S. Witnesses § 455.

It should also be noted that the Court is aware, through the deposition of Gerome Vayda, that Ghio was terminated from his employment with Bache for alleged unauthorized transactions.

The evidence in this case heavily preponderates in favor of the conclusion that James Ghio was responsible for the unauthorized trading which occurred in the Poplar Grove account. There emerges from all the evidence a series of transactions culminating in a scheme by Ghio to first initiate unauthorized trades and then to use various methods at his disposal to attempt to cover his tracks.

Although the case involves a substantial federal question, which would be

grounds for invoking the jurisdiction of this Court, jurisdiction was originally based on diversity of citizenship, and the couching of the case in that posture requires this Court to consider whether or not state law would also apply.

The defendant argues that certain language in the conference report concerning the 1974 amendments to 7 U.S.C. § 1, et seq., and a recent Arkansas state case are authority for the proposition that Louisiana law of mandate should not apply. We do not find that argument persuasive. The House conference report dealing with the amendments to the Act, Report No. 93–1383, 1974 Cong. and Admin.News, p. 5843 at p. 5897 states in part:

> "Under the exclusive grant of jurisdiction to the Commission, the authority in the Commodity Exchange Act (and the regulations issued by the Commission) would preempt the field insofar as *futures regulation is concerned*. Therefore, if any *substantive State law regulating futures trading* was contrary to or inconsistent with Federal law, the Federal law would govern. In view of the broad grant of authority to the Commission *to regulate the futures trading industry*, the Conferees do not contemplate that there will be a need for any supplementary *regulation by the States*." (Emphasis added.)

The Arkansas case, *International Trading Ltd. v. Bell*, 556 S.W.2d 420 (Ark.—1977), involved the alleged violation of a state security regulation statute. The Court there held that the state court did not have jurisdiction because the language of the Act expressed a "clear intention to vest exclusive jurisdiction of the *regulation of commodity options* in the Commodity Future Trading Commission." (Emphasis added.) At 423. The italicized language in both quotations makes it clear that both are dealing with regulation of commodity trading by the state. The law of mandate is not intended, nor does it attempt to *regulate the operations of the commodity market*. The mandate law exists to control the relationships between principal and agent. The distinction must be made between reg-

ulation of the market and control over agent-principal relationships. Preemption of the regulation of the market does not also mean preemption of all law that might involve participants in the market. See *McCurnin v. Kohlmeyer & Co.*, 347 F.Supp. 573 (E.D.La.—1972). We now find that, as a matter of law, the Louisiana law of mandate is applicable to the present situation.

Under Louisiana law, specifically Louisiana Civil Code article 2320, Bache is responsible for the acts of Ghio while Ghio is acting within their employ. *Daughdrill v. Diamond M. Drilling Co.*, 447 F.2d 781 (CA 5—1971); *Geeck v. Jahncke Service, Inc.*, 249 So.2d 241 (La.App.—1971). No where in the evidence is it seriously contested that Ghio was acting outside the employ of Bache when he committed these intentionally fraudulent acts. Therefore the acts of Ghio are in effect the acts of Bache.

Bache is the agent of Poplar Grove, its principal. The law imposes responsibilities on the agent while he is acting on behalf of his principal, foremost of which is that he shall not go beyond the authority vested in him by the principal. Article 3010 of the Louisiana Civil Code provides:

> "The attorney cannot go beyond the limits of his procuration; whatever he does exceeding his power is null and void with regard to the principal, unless ratified by the latter, and the attorney is alone bound by it in his individual capacity."

The account executive had no discretion in trading on the Poplar Grove account. Any trading done without the express authorization from Poplar Grove, through Carter Wilkinson, was done "outside the limits of his procuration."

Furthermore, Article 3003 of the Louisiana Civil Code instructs, in part, that:

> "The attorney is responsible, not only for [his] unfaithfulness (improperly translated from the French—should read "fraud") but also for his fault or neglect . . . ."

The Court concludes that absent ratification, or some other reason for exculpation, Bache is responsible for the damage Ghio caused Poplar Grove by his fraudulent acts.

The defendant contends that the plaintiff cannot recover for damages allegedly caused by Ghio's unauthorized dealings because the plaintiff's representative, Carter Wilkinson, did not abide by a clause in the customer's agreement signed by Wilkinson on September 12, 1974. The plaintiff, on the other hand, argues that this customer agreement was in effect only for the 1974 crop year and is inapplicable to the case at hand. We cannot agree with either argument.

In 1974, when the plaintiff opened an account with Bache, Carter Wilkinson signed a customer agreement which contained a certain clause which the defendant seeks to use to exculpate itself from the unauthorized actions of Ghio. That clause reads as follows:

> "10. Reports of the execution of orders and statements of my account shall be conclusive if not objected to in writing within five days and ten days, respectively after transmittal to me by mail or otherwise." (Sic)

Attached to this agreement and made a part thereof is a resolution by the board of directors of Poplar Grove giving Carter Wilkinson the authority to deal in the futures account. Typed in at the bottom of this resolution is the limiting clause that such authority is "limited to the sale of sugar Futures for the 1974 crop year in the amount of approximately one-half (½) of the expected crop." It is this clause which the plaintiff asserts limits the resolution and customer agreement contract to one year, the 1974 crop year.

Both the customer agreement and the attached resolution contain clauses which specifically state that each is to remain in effect until termination in writing. The resolution also states that even if the account were temporarily closed or inactive, as was the case here, the resolution was to remain in effect until written notice of revocation. No such termination was ever communicated by either party. Furthermore, this Court is convinced by the evidence that both parties intended to abide by the agreement and resolution beyond the 1974 crop year.

Although the typed-in limiting language may have been fully viable during the 1974 crop year as a term for the contract, after that year all parties involved continued to operate under the terms of the agreement and resolution. In fact, Carter Wilkinson testified that he was limited in the number of contracts he could trade—65 contracts, one-half the 1974 crop year. He was under the impression that this limitation still existed. After the 1974 crop year the typed-in limitation existed only as a limitation on the number of contracts, not as a *term* for the contract.

■ Even if such an interpretation were erroneous, the terms of both the customer agreement and the resolution tacitly applied to both parties. The board of directors of Poplar Grove was fully aware of Carter Wilkinson's trading in 1975 and 1976. Testimony at the trial was that Carter Wilkinson, even in 1976, was the only one with authority to trade in the account, exactly as the terms of the resolution state, and the board benefited greatly from his activities. They ratified his actions and in so doing ratified the agreement he acted under. Poplar Grove cannot be allowed to accept the benefits of the trading by Carter Wilkinson and then disclaim the contracts under which he acted.

■ Notwithstanding this Court's ruling concerning the applicability of the customer agreement beyond the year 1974, it cannot agree with Bache that clause 10 of that agreement exculpates it from the fraudulent, intentional acts of its account executive. It is against public policy for Bache to be allowed to exculpate itself by contract from the intentional acts of its agent, James Ghio. Although the clause is not per se an exculpatory clause, the defendant is nevertheless seeking to hide behind it, and thus avoid liability for the intentional illegal acts of its agent. This it cannot do. Such attempts to exculpate oneself from intentional acts have been similarly dealt with by other courts. See *Hayes v. Hayes*, 8 La.Ann. 468 (La.—1852); *Brady v. Glossen*, 87 Ga.App. 476, 74 S.E.2d 253 (1953);

*Kuzmiak v. Brookchester, Inc.,* 33 N.J.Super. 575, 111 A.2d 425 (1955); *Swisscraft Novelty Co., Inc. v. Alad Realty Corp.,* 113 N.J.Super. 416, 274 A.2d 59 (App.N.J.—1971); *Fuentes v. Owen,* 310 So.2d 458 (Fla. App.—1975); Restatement, Contracts §§ 574, 575; 6A Corbin, Contracts § 1472 at 597 (1962); 17 C.J.S. Contracts § 262 at 1168.

We must now address the question of damages. The first alleged unauthorized transaction occurred on July 8, 1976, when Bache, without authority from Poplar Grove, purchased twenty contracts of October sugar; 7 at 15.03 (cents per pound), 3 at 15.04, 5 at 15.10, and 5 at 15.12. Carter Wilkinson, representative of Poplar Grove, received confirmation of these purchases on July 12, and notified Mr. Ghio by telephone on or about July 13 that the purchases were not authorized. Ghio acknowledged that the trades were in fact improper and assured Wilkinson that they would be corrected. The evidence indicates that the trades were not corrected and remained in the Poplar Grove account until September 15. At that time the 20 contracts were sold at 8.28, resulting in a loss to Poplar Grove of $152,129.60. The amount of this loss, as well as the subsequent losses, was determined in the following manner. If the initial transaction was the unauthorized purchase of contracts, then the loss is determined by subtracting the total amount received from the final sale from the total amount expended in the initial purchase. If the initial transaction was the unauthorized sale of contracts, the loss is determined by subtracting the total amount expended to cover the unauthorized sale from the total amount received from the sale. These total amounts are determined by using the following formula:

Number of contracts × price paid or received per pound × 1120 (pounds per contract) = total amount spent or received. This figure does not take into consideration commissions which will be discussed separately.

According to the testimony, Carter Wilkinson notified Ghio one day after he became aware of the mistaken trades. Ghio at that time assured him that they were in fact mistakes and would be taken care of at no cost to Poplar Grove. As far as Wilkinson was concerned, Ghio was Bache Halsey Stuart Inc., and this being the first instance of an unauthorized trade, this Court cannot say that calling Ghio when he did entailed any unreasonable delay.

The second unauthorized trade occurred on July 9th when five London sugar contracts were purchased for the Poplar Grove account; 2 at 211.00 and 3 at 211.50. Customer confirmation of these purchases was received by Poplar Grove on July 13th. Wilkinson immediately protested to Ghio, who said the purchases were erroneously made and would be cancelled immediately. This was not done and the sugar contracts remained in the account until August 4th, when they were transferred to Carter Wilkinson's private account. This cancellation and transfer did not result in a direct loss to Poplar Grove, but the contracts did create the need for a margin call in Carter Wilkinson's private account, which was improperly paid with Poplar Grove funds. This occurred when Poplar Grove sent $57,000 in response to a margin call from Bache. Only $34,000 was credited to Poplar Grove, while the rest, $23,000, went into Carter Wilkinson's private account to cover margin calls which resulted from the London sugar contracts being placed in his account. Although it was not proved at trial who was responsible for the improper allocation of funds, it is clearly evident that the fraudulent action of Ghio was the sole cause of the need for a margin call, and the misapplication of the funds. Sufficient connexity exists to find that the actions of Ghio caused this loss to Poplar Grove. It is also noteworthy that no confirmation was sent to Carter Wilkinson concerning the transfer of the London sugar contracts to his account. This error was not noted until the monthly statements were received in September.

On July 30th, the third alleged unauthorized trade occurred when Bache "sold short" 25 contracts of March sugar at 13.13 and improperly covered this transaction by

purchasing 40 contracts of March sugar on August 2nd; 10 at 13.12, 5 at 13.19 and 25 at 13.20. The remaining 14 unauthorized sugar contracts remained in the account of Poplar Grove until September 23rd, when they were sold at 8.64. These transactions resulted in a loss to Poplar Grove of $77,616.00.

Poplar Grove received confirmation of the initial sale of the 25 contracts on August 3rd, the day after the subsequent 40 contracts had been purchased. Carter Wilkinson called Bache that day and complained to Mr. Ghio, who assured Wilkinson that the error had already been corrected. However, on August 6th, Poplar Grove received confirmation of the 40 contracts purchased on August 2nd. Wilkinson testified that he called Ghio immediately and complained that 15 extra contracts were now in the account. Again Ghio admitted the error, stating that it was an overcompensation and assured Wilkinson that the account would be straightened out.

An alleged unauthorized sale of 15 September sugar contracts occurred on August 6th but was cancelled with no loss to Poplar Grove.

The next alleged unauthorized transaction occurred on August 10th when Bache sold 20 contracts of September sugar; 17 at 10.86, 2 at 10.87 and 1 at 10.90, and then offset these transactions with the purchase of 20 September sugar contracts, 10 at 11.00, 5 at 11.05, and 5 at 11.10. This activity resulted in a loss to Poplar Grove of $3,908.80. As before, the testimony was that as soon as Carter Wilkinson received confirmation of the sale, he called Ghio. This time Ghio truthfully stated that the error had already been corrected.

About September 10th, Poplar Grove and Carter Wilkinson received their statements from Bache for the month of August. Upon noting that the July 8th purchases were still in the account, and that 15 extra contracts from the August 2 purchase were still present, and that there had been improper crediting of funds wired to Bache, Carter Wilkinson collected his documents and went to the New Orleans office of Bache to meet with Ghio. According to the testimony of Carter Wilkinson, he and Ghio met and straightened out the problems and made a list of the unauthorized trades that had occurred in the account. Mr. Ghio explained to him that since a long period of time had passed since the July 8th and August 2nd purchases, the only way to rid Poplar Grove of those contracts was to liquidate them, recognize a deficit in the account, and credit Poplar Grove with the correct amount. Poplar Grove did not receive credit for those deficits.

The last unauthorized transaction occurred on September 16th when Bache sold 10 contracts of October sugar at 7.95 and offset this transaction five days later with the purchase of 10 contracts at 8.74. This resulted in a loss to Poplar Grove of $8,848. There is no evidence that Wilkinson called or notified Bache with regard to this transaction, nor is there any evidence that Wilkinson did any act toward ratification of this transaction. There does appear evidence that this sale was the result of a miscalculation by Ghio while he was liquidating the account of the unauthorized contracts as he agreed to do during the conference with Wilkinson.

The defendant makes much of the fact that many of the variation margin calls made during this period in question were attributable to the contested trades and that this should have put Carter Wilkinson on notice that unauthorized contracts existed in the account. There is no showing that such margin calls would have put him on notice appreciably sooner than did the receipt of the confirmations. After their receipt the margin calls were merely evidence of what Wilkinson already knew. Carter Wilkinson testified in his deposition that he was aware that he was paying margin calls on unauthorized contracts but did so fearing that if he didn't, Bache would liquidate authorized contracts to pay the margin calls. He further testified that he felt Bache would credit the account for those payments once the errors were straightened out. Admittedly, this may not have been a wise business choice but under the circum-

stances of this case, it certainly cannot be considered ratification.

Generally ratification exists where there is an acceptance by the principal of benefits of the agent's acts with full knowledge of the facts and circumstances surrounding the act or when the principal makes an affirmative election to adopt the unauthorized arrangement. *Julien J. Studley, Inc. v. Gulf Oil Corp.,* 282 F.Supp. 748 (S.D.N.Y.— 1968); *Jordan v. Smith,* 206 La. 765, 20 So.2d 17 (1944).

The burden of proving a principal's ratification is on the defendant agent, and an intention to ratify the unauthorized acts will not be inferred when the act can be otherwise explained. *McCurnin v. Kohlmeyer,* supra; *O. E. Haring, Inc. v. Boylan's Private Police,* 56 So.2d 588 (La.App.— 1952); *Monroe Milk Station, Inc. v. Sur-Wa Stores,* 167 So. 771 (La.App.—1936); *International Accountants Society v. Santana,* 166 La. 671, 117 So. 768 (1928).

On every occasion of an unauthorized trade, Poplar Grove notified Bache by telephone within one or two days of receipt of the confirmation or monthly statement. On two occasions the unauthorized transactions had already been corrected, albeit erroneously, by the time Wilkinson called. Wilkinson walked out of the September conference apparently convinced that all was well and that Poplar Grove would not lose money from the unauthorized trades. Admittedly, in hindsight, Wilkinson might have done things differently, but the Court does not judge on that basis. The burden on the defendant is to prove that Wilkinson had sufficient knowledge to ratify the acts or that such ratification could be inferred from his action or inaction. Neither have been proved by the defendant sufficient to carry that burden.

The plaintiff seeks $4,770 in improperly paid commissions. The defendant, on the other hand, admits in its evidence that the commissions made from the unauthorized trades amounted to $5,483.25. This being an admitted fact from the party in the best position to know, that figure will be accepted.

Mention should be made of the plaintiff's request for $12,100, which was allegedly improperly credited to Carter Wilkinson's personal account instead of Poplar Grove's. The plaintiff seeks this money alleging a violation of 7 U.S.C. § 6d which states in pertinent part:

"It shall be unlawful for any person to engage as futures commission merchant in soliciting orders or accepting orders for the purchase or sale of any commodity for future delivery, . . . unless—

". . .

"(2) such person shall . . . treat and deal with all money, securities, and property received by such person to margin, guarantee, or secure the trades or contracts of any customer of such person, . . . as belonging to such customer. Such money, securities, and property shall be separately accounted for and shall not . . . be used to margin or guarantee the trades or contracts, . . . of any customer or person other than the one for whom the same are held: . . ."

Although it appears that this statute was violated, there has been no showing that the money credited to Carter Wilkinson's account was used to pay margin calls on any unauthorized trades. As far as this Court is concerned, the $12,100 was merely credited to the wrong account and could now be credited back by a debit to Carter Wilkinson's account. But since only damages are requested in this matter, the Court will not grant such relief nor will it award this item of alleged damage.

The plaintiff has requested reasonable attorney fees. However, attorney fees may not be recovered as damages unless they are specifically authorized by statute or contract. *Nat Harrison Associates, Inc. v. Gulf States Utilities Co.,* 491 F.2d 578 (CA 5—1974); *Bank of the South v. Fort Lauderdale Technical College, Inc.,* 301 F.Supp. 260 (E.D.La.—1969). Neither situation exists in the present case. This request is denied.

For the reasons stated, the Court concludes that the evidence in this case prepon-

derates in favor of the plaintiff and that said plaintiff is entitled to recover from the defendant the sum of $270,985.65, together with interest at the legal rate from the date this suit was filed until paid, and for all costs properly assessable in this suit. Judgment will be entered accordingly.