**David C. MEYERS et al., Plaintiffs,**

v.

**Shearn MOODY, Jr., et al., Defendants.**

**and**

**Bernard HAINES et al., Plaintiffs,**

v.

**Shearn MOODY, Jr., et al., Defendants.**

**and**

**Charles H. PAYNE, Receiver,**

v.

**Shearn MOODY, Jr.**

**Nos. CA–3–5678–D, CA–3–7625–D.**

United States District Court,
N. D. Texas,
Dallas Division.

May 29, 1979.

William Emerson Wright, Houston, Tex., for plaintiffs.

Dean Carlton, Dallas, Tex., for defendants.

## MEMORANDUM OPINION AND ORDER

ROBERT M. HILL, District Judge.

The Defendant's Motion for Judgment on the Verdict; in the Alternative, for Judgment N.O.V.; and in the Further Alternative, for a Partial New Trial and for Dismissal for Failure to State a Claim Upon Which Relief Can Be Granted came on for consideration before the court, the Honorable Robert M. Hill, United States District Judge. The court has considered the motion and is of the opinion that the motion should be denied.

### I. *Damages*

Defendant Shearn Moody, Jr.'s (Moody) primary attack upon the jury's verdict in this case, camouflaged among some 82 alleged grounds of error, centers on its findings of damages. The jury found that five million dollars would compensate Empire Life Insurance Company of America (Empire) for damages caused by the depletion of its stockholders' capital and surplus proximately caused by Moody's negligent mismanagement, breach of fiduciary duty and violations of federal securities law. Court's Charge to the Jury (Charge), Question No. 10. It further found that Moody should pay one million dollars in punitive damages as a result of his intentional misconduct and gross negligence in managing Empire. Charge, Question No. 12. The court instructed the jury that, in determining Empire's damages, it should only consider "the amount of impairment at the time of Receivership, if any, to the corporation consisting of the loss of capital and paid in surplus." Charge, at 21. Moody essentially contends that the court did not instruct the jury as to the correct measure of damages, and that the plaintiff, Empire's receiver (Receiver), did not present sufficient evidence to support an award of damages.

### *Waiver*

 At the outset, the court must determine whether Moody has waived his objections to the jury's verdict on damages for purposes of his motions for judgment n. o. v. and for a partial new trial. F.R.Civ.P. 50(a) requires that a motion for a directed verdict state the specific grounds therefor. Further, a party may not assert a ground in a motion for judgment notwithstanding the verdict that was not included in the motion

for a directed verdict. 9 Wright & Miller, Federal Practice and Procedure, § 2537 at 598; *Sulmeyer v. Coca Cola Co.*, 515 F.2d 835, 846 (5th Cir. 1975). Moody did assert in his motion for a directed verdict that Empire's insolvency is not the proper measure of its damages. (T. 1416). He did not, however, specifically contend that measurement of Empire's damages as of the time of the Alabama receivership adjudication was incorrect. Furthermore, he did not specifically contend as the ground for Receiver's failure to introduce sufficient evidence of damages the reliance of its expert witnesses upon an incorrect accounting method. (T. 1414–16). Therefore, he may not allege these grounds in a motion for judgment notwithstanding the verdict.

Federal Rules of Civil Procedure 46 and 51 govern whether Moody may present in a motion for new trial his objections to the jury's verdict on damages. These rules require that a party specifically and timely object to the introduction of evidence or to an instruction to the jury, and give specific grounds therefor, in order to preserve such objection for a motion for new trial. *See Patton v. Archer*, 590 F.2d 1319 (5th Cir. 1979); *Jamison Co. v. Westvaco Corp.*, 526 F.2d 922 (5th Cir. 1976); 9 Wright & Miller, Federal Practice and Procedure, § 2472. Since Moody did not object at trial to Receiver's expert testimony on damages on the specific ground that it was based upon improper accounting principles, he has waived any objection to the admission of such testimony. Moody did object to the submission to the jury of question 10 concerning damages on the ground that insufficient evidence supported its submission. (T. 2399). He also objected to the measure of damages set forth in question 10 on the ground that damages should be measured as of the time of each wrongful act alleged. (T. 2403). Accordingly, Moody may assert as grounds for new trial that plaintiff did not present evidence of sufficient weight to support the jury's finding of damages and that question 10 stated an improper measure of damages.

*Measure of Damages*

Receiver is entitled to recover on behalf of Empire compensation for losses proximately caused to the company by Moody's negligence and breach of fiduciary duty. *See Home Telephone Co. v. Darley*, 355 F.Supp. 992 (N.D.Miss.1973), *aff'd per curiam*, 489 F.2d 1403 (5th Cir. 1974); *Hux v. Butler*, 339 F.2d 696, 701 (6th Cir. 1964); 19 C.J.S. Corporations § 833d. Receiver may also recover on behalf of Empire damages proximately caused to it by Moody's violations of Rule 10b–5. *Moody v. Bache & Co., Inc.*, 570 F.2d 523, 527 (5th Cir. 1978); *Herpich v. Wallace*, 430 F.2d 792, 810 (5th Cir. 1970). This much is clear. What is not clear is how to measure the loss to Empire. Neither Texas law nor federal securities law provides a clear guideline, so this court must fashion a measure of damages which comports with the sparce precedent available and which is just. *See Spiegel v. Beacon Participations*, 297 Mass. 398, 8 N.E.2d 895, 909 (1937). There being no indication otherwise, the court presumes that the measure of damages for Receiver's common law and securities law claims does not differ under state and federal law. *Cf. Pappas v. Moss*, 303 F.Supp. 1257, 1281 (D.N.J. 1969).

In *Commonwealth of Massachusetts v. Davis*, 140 Tex. 398, 168 S.W.2d 216, 233 (1942), the Texas Supreme Court indicated that corporate loss may be measured in terms of loss of value or physical damage to corporate assets, restraints upon the marketability of corporate assets, and interference with the development of corporate properties. The Supreme Judicial Court of Massachusetts in *Spiegel v. Beacon Participations*, 297 Mass. 398, 8 N.E.2d 895, 909–911 (1937) assessed the damage caused to a corporation by an improper series of transactions according to loss in value of corporate assets. In *Spiegel*, certain directors of defendant Beacon Participations, an investment company, authorized the investment of corporate funds in a joint venture with an investment company owned by two directors of Beacon Participations. The trial court found the responsible directors of Beacon Participations "grossly negligent"

and in breach of their fiduciary duty to the company in authorizing this transaction because they did not require a capital investment or other security from the company's joint venturer and thus put Beacon Participations' capital at risk for the benefit of the joint venturer and not for the benefit of the company. The venture suffered losses in excess of $60,000. Since the responsible directors' wrongdoing consisted in the very entering of the joint venture and not in the particular transactions conducted by the venture, the court approved a rule of damages assessing the responsible directors for one-half the losses sustained by the joint venture as a result of transactions entered into while they remained directors. The court ruled that damages should be measured "according to general principles of gain and loss" as of the date of the final hearing to determine damages. *Spiegel, supra,* 8 N.E.2d at 911. Thus, the value of the stock remaining in the hands of the joint venture, sums realized from the sale of such stock, and contributions by the joint venturer were to be taken into account in calculating losses.

In *Insuranshares Corp. v. Northern Fiscal Corp.,* 42 F.Supp. 126 (E.D.Pa.1941), a federal district court also analyzed damages caused to a corporation by a wrongful series of transactions according to loss in value of corporate assets. In that case the controlling shareholders of an investment corporation were found liable for turning over control of the corporation to persons who looted the assets of the company through a series of fraudulent transactions and who, in turn, transferred control of the corporation to another person, who looted the corporation further. The *Insuranshares* court interpreted the "orthodox rule" of damages formulated in *Spiegel* to be the "difference in dollars between the assets of the plaintiff before the acts complained of and those found remaining at the time of suit" and applied a variant of that rule. The court varied from the *Spiegel* measure of damages in assessing damages as of the time of suit according to the loss in value of corporate assets caused by the defendant's wrongdoing less the increase in value of

corporate assets also attributable to defendant's wrongdoing.

■ The measure of damages instructed to the jury in this case logically follows the formulations in *Spiegel* and *Insuranshares.* "The amount of impairment at the time of Receivership, if any, to the corporation consisting of the loss of capital and paid in surplus" proximately caused by the acquisition program negligently and fraudulently engineered by Moody takes into consideration the losses and gains in value of Empire's assets caused by Moody's wrongdoing and the increases and decreases in corporate liabilities caused by his wrongdoing. It measures loss according to general principles of gain and loss.

The measure of damages instructed to the jury differs from that employed in *Spiegel* and *Insuranshares* in that gains and losses are valued as of the time of the receivership adjudication. *Spiegel* applied a true rescissory measure of damages in determining loss as of the time of the hearing to determine loss. *See* Note, *The Assessment of Damages in Rule 10b–5 Cases,* 26 Stan.L.Rev. 371 (1974). As did this court, the *Insuranshares* court applied a rescissory measure of damages but chose a post transaction date earlier than the date of the hearing to determine damages on which to measure damages. It measured damages as of the date of suit.

Moody contends that damages should be measured as of the time of each transaction constituting the acquisition program. He thus argues for an out-of-pocket measure of damages. *See* Note, 26 Stan.L.Rev. 371 (1974). The Fifth Circuit recently applied an out-of-pocket measure of damages in a shareholder's derivative suit brought under Florida law to challenge a corporation's purchase of its own shares at an inflated price. *Schilling v. Belcher,* 582 F.2d 995, 1005 (5th Cir. 1978). *But see Dupuy v. Dupuy,* 551 F.2d 1005, 1024–25 (5th Cir. 1977); *Bird v. Ferry,* 497 F.2d 112 (5th Cir. 1974); *Colvin v. Dempsey-Tegeler & Co.,* 477 F.2d 1283, 1288 n. 7 (5th Cir. 1973) (out-of-pocket measure of damages not ap-

plied). Although an out-of-pocket measure of damages may be proper in a suit challenging a market transaction entered into by a defendant with numerous sellers or buyers, plaintiffs in Receiver's position would be deterred from bringing suit if required to go to the expense of segregating a series of transactions over a number of years for purposes of calculating losses. *Cf. Daniels Towing Services, Inc. v. Nat Harrison Associates, Inc.*, 432 F.2d 103, 106 (5th Cir. 1970); *Hunter v. Shell Oil Co.*, 198 F.2d 485, 490 (5th Cir. 1952). Furthermore, an expert witness, James Lewis George (George), testified that Empire's loss was caused by the cumulative impact of the transactions constituting the acquisition program, (T. 597). A measure of Empire's loss which aggregated the separate impact of each transaction would therefore not be consistent with the cause of Empire's loss.

A commentator has suggested that courts sometimes measure damages as of a post transaction date other than the date of the hearing to determine damages because such a date is the earliest on which a precise valuation of loss can be made. Note, 26 Stanford L.Rev. 371, 375 (1974). Citing *Niles v. New York Central*, 176 N.Y. 119, 68 N.E. 142 (1903), Moody contends in his memorandum of law (p. 24)—in the alternative, it appears, to his argument for an out-of-pocket measure of damages—that the best date for valuing Empire's loss, if any, is some future date when Empire's assets are liquidated. Clearly, Receiver need not await Empire's liquidation to receive compensation for the loss incurred by Empire as a result of Moody's wrongdoing. *See Spiegel, supra*, 8 N.E.2d at 911. The date instructed to the jury on which to measure Empire's loss—the date of Receivership—is a proper date on which to assess damages in this case for two reasons. One, George testified that Empire's damages became measurable "at such time as the Insurance Commissioner stepped in and said the valuation of the Trust Interest is not an amount any where near the amount you are carrying it," (T. 598) and receivership adjudication shortly followed the devaluation of Moody's trust interest. Two, valuation of

Empire as of the date of Receivership permitted the jury to take into account the impact of an adjudication of insolvency on Empire's value. *See* discussion at p. 241, *infra.*

In addition to being proper, the date instructed to the jury on which to measure Empire's damages is fair to Moody. One criticism of the rescissory measure of damages is that it permits market forces for which the defendant is not responsible to affect the amount of damages awarded. *See* Note *supra.* The Second Circuit justified a rescissory measure of damages—the difference between the purchase price of certain securities and the sale price of the securities—on the ground that the buyer would not have purchased the securities at any price but for the misrepresentations of the defendant, his stockbroker. *Chasins v. Smith, Barney & Co.*, 438 F.2d 1167, 1173 (2d Cir. 1970); *see Dupuy, supra*, 551 F.2d at 1025; *cf. Colvin, supra*, 477 F.2d at 1288 n. 7. Since the evidence in this case shows that Empire *could not* have embarked upon the acquisition program but for the inflated trust interest (e. g., T. 542–43), the court is justified on the ground adduced in *Chasins* in applying a rescissory measure of damages.

Under the circumstances of this case, furthermore, measurement of the loss caused to Empire by the acquisition program at a date later than the acquisitions themselves probably benefits Moody. Measurement of Empire's value following the acquisition program gives the "downstream investments" acquired by Empire during its acquisition program, *see* discussion at p. 240, *infra*, a chance to produce income and thereby mitigate Empire's loss. On the other hand, since it would become difficult to assess the damages attributable to Moody's actions after Empire had fallen into the hands of the Receiver, *cf. Insuranshares, supra*, 42 F.Supp. at 131, measurement of damages as of the date of receivership avoids the possibility that Moody will pay for any losses caused by the Receiver. The court notes, finally, that Moody has not offered any evidence which would show

that measurement of Empire's damages as of a given date would result in significantly lower damages than that achieved by measuring Empire's damages as of the date of receivership. For the reasons set forth above, the court is of the opinion that it instructed a fair and proper measure of damages to the jury.

### Proof of Injury and Damages

Receiver chiefly relies upon George's expert testimony to support the jury's award of damages. George testified that the increase in valuation of the Moody trust interest from approximately $5,800,000 to approximately $14,000,000 enabled Empire to embark upon an aggressive program of mergers with insurance companies, purchases of controlling interests in insurance companies, and purchases of blocks of insurance in force all of which "created huge drains on surplus" (T. 542) and ultimately caused damages to Empire measurable in 1972 in a range between $7,000,000 and $10,000,000. (T. 601–603). George explained that the acquisition program created drains on surplus because the assets acquired generated income "downstream." Hence, they were valued according to statutory accounting principles at an amount significantly below their costs. George labelled this difference between cost and statutory value as "unrealized investment losses" and calculated these to be $9,207,242 in his chart analyzing changes in stockholder's equity in Empire between 1964 and 1972 (Px. 19). The capital structure of Empire could withstand this drain on surplus only so long as the trust interest remained valued at $14,000,000. When it was devalued by the Alabama Commissioner of Insurance, Empire instantly became insolvent. Another expert, Hilton Painter, described the effect of the acquisition policy as "looting" the "good hard assets" of Empire (T. 137) because the acquisitions ultimately were supported by Empire's liquid assets rather than by the trust interest. Two other experts, Frank I. Schmidt and Ben Larson, concurred that

the acquisition program caused Empire to become insolvent. (T. 319, 1279). Larson also opined that Empire made "bad acquisitions." (T. 1278–79). George's calculation that Empire incurred realized investment losses of $2,964,591 between 1964 and 1972 (Px. 19) supports this assessment.

George arrived at his range of damages by taking the stockholders' deficit of $7,000,000 generated by his analysis of changes in stockholders' equity from 1964–1972 as the low point of the range and by taking the $14,000,000 deficit "reflected in Best Reports concerning the ultimate bulk reinsurance" by Protective Life Insurance Company of Alabama (Protective) of Empire (T. 602), less a $4,000,000 value for the trust interest, as the high point. Protective, the highest bidder for Empire's assets and liabilities [1] after Empire entered receivership, required that a $13,000,000 moratorium be imposed for ten years on the cash values of insurance policies issued by Empire (T. 1180–82, 1244), evidence that, in real business terms as well as according to statutory accounting principles, Empire's liabilities significantly exceeded its assets in 1972.

Moody attacks George's testimony on the ground that, if he had employed generally accepted accounting principles rather than statutory accounting principles, he would have valued the "downstream" assets that Empire acquired through its acquisition program much higher, and may have determined that Empire was in fact solvent at the time it entered receivership. Moody alleges that George relied solely upon statutory accounting principles in forming his opinion as to the damage caused by the acquisition program to Empire and therefore his testimony does not sufficiently prove that Empire suffered actual damages.

George testified that statutory accounting principles are the rules that each state has evolved in regulating insurance companies, whereas generally accepted accounting principles have been established for stock life insurance companies by the accounting

1. The assets for which Protective bid did not include a fund of $2,000,000 retained by Receiver to pay creditors other than policy holders (T. 1177).

profession (T. 531). He also testified that there are material differences between the two methods of accounting (T. 531). Some evidence in the record, in addition to cases cited by Moody, specify certain of these material differences, DX 42 n. 1; *see, e. g., Norte & Co. v. Huffines*, 304 F.Supp. 1096, 1103 (S.D.N.Y.1968), *aff'd in part, rev'd in part and remanded*, 416 F.2d 1189 (2d Cir. 1969); *Franklin Life Insurance Co. v. U. S.*, 399 F.2d 757 (7th Cir. 1968), but Moody nowhere has presented evidence cognizable by this court of a comprehensive valuation of Empire's assets and liabilities at the time Empire entered receivership according to generally accepted accounting principles. Rather, it has pointed to the values of Empire's "non-admitted assets" as of December 31, 1970, included in Empire's Annual Statement and the NAIC Zone Examination Report of Empire (PX 80, Ex. B, p. 54; DX 37, p. 14). Moody also relies upon testimony that a block of whole life insurance has a rule of thumb value for business purposes of one-and-one-half times the annual premium income of the block of insurance and no value according to statutory accounting principles (T. 989–990, 1339–1340). He then calculates the rule of thumb value of Empire's insurance in force in 1970 (DX 37, p. 4) to underscore the inadequacy of George's determination of damages.

Moody's assorted examples of assets undervalued and non-valued under various theories do not persuade the court that Receiver's proof of damages is inadequate to support the jury's award. In determining whether proof of damages is "speculative," a court must first decide whether defendant's wrongdoing proximately caused injury in fact to the plaintiff. *Aldon Industries, Inc. v. Don Myers & Associates, Inc.*, 517 F.2d 188, 191 (5th Cir. 1975). If so, plaintiff need not prove the extent of damages with mathematical precision. Where the wrong is of such a nature as to preclude exact ascertainment of the amount of damages, the court need only determine, second, whether the jury could have made a just and reasonable inference of the extent of damages from the evidence. *Kestenbaum v. Falstaff Brewing Corp.*, 514 F.2d 690, 698

(5th Cir. 1975); *Daniels Towing Service, supra*, 432 F.2d at 106.

In accordance with this framework, the court makes the primary determination that the evidence supports a finding that Moody's common law and federal securities law violations proximately caused economic injury in fact to Empire. The expert testimony by George and others cited above sufficiently establishes a causal link between the fraudulent valuation of the trust interest, the acquisition program, and injury in fact to Empire. Moody's contention that Receiver did not adequately prove injury in fact fails for several reasons.

First, Moody misreads George's testimony. George did not rely entirely upon statutory accounting principles to show that Empire suffered economic loss. Rather, he relied upon those principles to measure the extent of Empire's economic loss as of a particular date. The import of George's testimony was that Empire's rapid acquisition of downstream assets based upon a fraudulently created surplus destined its financial ruin, measured by any accounting method, upon discovery of the fraud and the proper valuation of its surplus. Thus, he testified that the acquisition program "ultimately put Empire Life Insurance Company into a category that would classify it as insolvent, both statutorily and otherwise." (T. 544).

Second, Moody does not consider the impact of receivership upon the value of Empire's assets. The evidence amply supports a jury finding that Moody should have foreseen at the outset of the acquisition program that Empire's statutory insolvency and entry into receivership would ensue upon the devaluation of its fraudulently inflated trust interest. Therefore, the jury could properly have measured Empire's assets as of the date it entered receivership according to their value under the circumstances of receivership and not according to their value on the open market. Protective's requirement of a moratorium shows that the value of Empire's assets under the circumstances of receivership were much

less than the amount of its liabilities and that Empire had suffered actual economic loss.

Third, even ignoring the impact of receivership, Moody's alternative valuations of Empire's assets do not persuade the court that Receiver has not sufficiently proven injury in fact. This court will not order a new trial on the highly speculative basis that, if required to value Empire's assets and liabilities according to methods other than statutory accounting principles, Receiver may be unable to prove injury in fact. The record does not indicate that the alternative methods of valuation proposed by Moody are superior to statutory accounting principles and does not contain a comprehensive valuation of Empire's assets and liabilities according to such alternative methods.

 Having determined that Receiver sufficiently proved injury in fact to Empire, the court turns now to the question of whether he adequately proved the extent of Empire's damages. George's testimony reveals that the injury to Empire caused by the acquisition program is not susceptible of exact determination. George testified to the overall detrimental impact of the acquisition program on Empire which became "measurable" only when the trust interest was devalued. (T. 596–98). Since Empire's damages may not be precisely determined, evidence supporting a reasonable approximation will suffice. *See Kestenbaum, supra,* 514 F.2d at 698. Furthermore, since Moody had the opportunity to present to the jury alternative methods of valuing Empire's assets, it cannot now complain that the measure of Empire's damages was not more precise. *See Fattore Co. v. Metropolitan Sewerage Comm'n.,* 505 F.2d 1, 6 (7th Cir. 1974).

 The court is of the opinion that the Receiver presented evidence from which the jury could draw a just and reasonable inference of the extent of damages suffered by Empire. George testified that insurance companies are "run and managed" and "bought and sold" according to statutory accounting principles. (T. 531–32) In esti-

mating a range of damages ($7,000,000–$10,000,000) caused to Empire by Moody's wrongdoing premised upon statutory accounting principles, George presented highly probative evidence to the jury of the extent of damage suffered by Empire. The $13,000,000 ten year moratorium imposed on the cash values of insurance policies issued by Empire was additional data on which the jury could base its damage award. The jury discounted George's estimate by $2,000,000, thus compensating for inaccuracies in his method of assessment which may have inflated the extent of Empire's damages. *See Locklin v. Day-Glo Color Corp.,* 429 F.2d 873, 884 (7th Cir. 1970). The Seventh Circuit, in *Fattore, supra,* permitted an award of damages to stand, even though premised upon a clearly incorrect method of computing damage, because the method employed was probative of the extent of damages and the trial judge rendered a "jury type verdict" by reducing the damage figure generated by the incorrect method. It by no means being settled that statutory accounting principles incorrectly measure the damages suffered by an insurance company, this court's decision to let the jury's verdict stand is less difficult than the *Fattore* court's decision.

Since Receiver proved that Moody's wrongdoing proximately caused injury in fact to Empire and adduced evidence upon which the jury could reasonably base its award of $5,000,000 compensatory damages, the court will not set aside the jury's finding of damages.

## II. *10b–5 Claim*

Moody makes a blunderbuss attack on the jury's finding that he violated Rule 10b–5. The jury found that "the increase in the value of the trust interest from 5.8 million to 14.2 million dollars together with the acquisition program was a devise, scheme or artifice to defraud by Moody in connection with the purchase and sale of securities," Charge, Question No. 6, and "an act, practice or course of conduct by Moody which operated as a fraud or deceit upon any person in connection with the purchase or sale of securities." Charge, Question No. 7.

The jury also found that "Moody's failure to state that the trust interest was intended by Moody to be non-transferable by Empire was an omission to state a material fact necessary to make his representations about the value and admissibility of the trust interest not misleading and was omitted with the intent to deceive or defraud in connection with the purchase or sale of securities." Charge, Question No. 8. It found, in response to Question No. 9, that these violations of Rule 10b–5(1), (2), and (3) were a proximate cause of damages to Empire's stockholders "capital and surplus", and, in response to Question 16, that such damages amounted to $5,000,000. Moody contends that these findings, in light of the instructions given to the jury, do not state a violation of Rule 10b–5. The court will examine seriatim the elements of a 10b–5 action to determine whether the jury's findings in light of the court's instructions support the entry of judgment on Receiver's 10b–5 claim.

The basic elements of a 10b–5 action are: (1) conduct by the defendant proscribed by the rule; (2) a purchase or sale of securities by the plaintiff in connection with such proscribed conduct, and (3) resultant damages to the plaintiff. *Woodward v. Metro Bank of Dallas,* 522 F.2d 84, 93 (5th Cir. 1975).

### Proscribed Conduct

Recent Supreme Court decisions have refined the sort of conduct proscribed by Rule 10b–5. Only conduct which can be fairly viewed as manipulative or deceptive is covered by Rule 10b–5. *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 473–74, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). A person who engages in deception in connection with the purchase or sale of a security does not violate Rule 10b–5 unless he intends to deceive the buyer or seller of the security. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Thus, a person who imparts false information to a buyer or seller of a security violates Rule 10b–5 if he knows of the falsity of the information or acts in reckless disregard of

its falsity. *First Virginia Bankshares v. Benson,* 559 F.2d 1307, 1314 (5th Cir. 1977).

Although Questions 6 and 7 to the jury differ in wording in accordance with the differing language of subsection (1) and (3) of Rule 10b–5, they essentially inquire whether Moody has engaged in deceptive conduct. *See Santa Fe, supra,* 430 U.S. at 473–74, 97 S.Ct. 1292; 1 A. Bromberg, Securities Law: Fraud, § 2.6(1) at 49 (1977). The evidence more than adequately demonstrates that Moody employed deceit to increase the value of the trust interest from 5.8 million dollars to 14.2 million dollars. Empire's Annual Report of 1965, DX 7, first announced to Empire's shareholders a valuation of $14,213,440 for the two-fifths of Moody's trust interest assigned to Empire. Empire's annual report for the previous year had stated a valuation of $5,813,440 for the trust interest. DX 9. The 1965 annual report stated that "[v]aluation of the trust was calculated by the national auditing firm of Ernst & Ernst and actuaries including Mr. Lloyd K. Friedman, F.S.A., consulting actuary of Houston." DX 7, at p. 7. Ernst and Ernst, however, had not "calculated" the $14,213,440 value for the trust interest. Rather, it had approved the method employed by Lloyd K. Friedman (Friedman) to calculate the value of the two-fifth's of Moody's trust interest assigned to Empire at $5,813,440. DX 16, PX 35. The data underlying the trust valuation came from Moody and Friedman, not from Ernst & Ernst, in contradiction to the clear import of the statement that Ernst & Ernst calculated the undivided value of the trust interest. Furthermore, Friedman employed a different method to calculate the undivided value of Moody's trust interest at $36,084,000. DX 74. Under all the circumstances the jury could readily conclude that Moody deceived Empire's shareholders into believing that the increased value of the trust interest formed a solid foundation to support the acquisition program, when in reality the $14,213,440 value had shaky underpinnings.

The wording of Questions 6 and 7 implies an inquiry into Moody's intent to defraud

Empire's shareholders. *See Ernst & Ernst, supra.* In connection with Question No. 6, the court defined "a device, scheme or artifice to defraud" as embracing an intent to deceive. Charge at 20. Since the evidence supports a finding that Moody intended to deceive Empire's shareholders as to the basis for the trust valuation, the jury's answers to Question No. 6 and 7 establish the element of "scienter" in Receiver's 10b–5 claim.

The court correctly defined "materiality" for purposes of Question No. 8, Charge at 20. *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976); *Smallwood v. Pearl Brewing Co.,* 489 F.2d 579, 603–04 (5th Cir. 1974). Under the evidence, the jury could reasonably find that Moody's omission to state that the trust interest was non-transferable was material and made with intent to deceive Empire's shareholders as to the value of the trust interest.

Moody contends that even if he deceived Empire's shareholders when he increased the trust valuation, he did not deceive Empire, for whom Receiver seeks recovery. The jury's finding that Moody dominated the business policy of Empire until at least March 21, 1970, by virtue of his power to nominate and elect a majority of the Board of Directors of Empire forecloses a finding that Moody deceived the Board of Directors in order to effectuate the acquisition program. Charge, Question 15; *See Superintendent of Insurance v. Banker's Life and Casualty Co.,* 404 U.S. 6, 7 n. 1, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971). Since a majority of the board of directors carries on the business of a corporation and its knowledge is imputed to the corporation, adherence to corporate formalism requires the conclusion that if a majority of board of directors of a corporation is not deceived, the corporation is not deceived. The Fifth Circuit, however, has rejected this position as incompatible with the remedial purposes of Rule 10b–5. *Shell v. Hensley,* 430 F.2d 819, 826–27 (5th Cir. 1970); *Rekant v. Desser,* 425 F.2d 872, 878 n. 14 (5th Cir. 1970). *Shell* did not articulate the "deception" involved when a majority of the board of directors of

a plaintiff corporation authorizes a securities transaction with knowledge of the fraud connected with the transaction. The court perhaps relied instead upon the "new fraud" approach rejected by the Supreme Court in *Santa Fe. See Schoenbaum v. Firstbrook,* 405 F.2d 215 (2d Cir. 1968), *cert. denied,* 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969); Note, *Suits for Breach of Fiduciary Duty Under Rule 10b–5 After Santa Fe Industries, Inc. v. Green,* 91 Harv. L.Rev. 1874, 1882 n. 49 (1978). Although *Santa Fe* does not overrule *Shell,* it at least calls for an articulation of the deception suffered by a corporation when a majority of its directors participate in the deception. *See Goldberg v. Meridor,* 567 F.2d 209, 217–18 (2d Cir. 1977), *cert. denied,* 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978). The Third Circuit, prior to *Santa Fe,* theorized that when a majority of the board of directors participates in a deception proscribed by Rule 10b–5, the shareholders become the corporate entity for purposes of being deceived. *Pappas v. Moss,* 393 F.2d 865, 869 (3d Cir. 1968); *see Goldberg,* 567 F.2d at 217 (reaffirming theory of constructive deception); Note, 91 Harv.L.Rev. 1874, 1883 (1978) (principles of agency law and nature of a shareholders derivative suit are theoretical bases for "constructive deception" of a corporation through minority shareholders). The Fifth Circuit appears to have adopted this theory of "constructive deception." In *Miller v. San Sebastian Gold Mines, Inc.,* 540 F.2d 807 (5th Cir. 1976), it held that a corporation could bring a 10b–5 action even though all the directors and shareholders of the corporation participated in the fraud. The persons deceived, according to the court, were the future shareholders of the corporation, who were the intended victims of the fraud.

■ This court instructed the jury that Empire's shareholders were among the persons whom Moody may have deceived in inflating the trust interest, Charge at 20–21, and related to the jury Receiver's contention that Moody deceived Empire's shareholders. Charge at 18. The jury's answers to Question 6, 7, and 8, therefore,

can reasonably be construed as findings that Moody deceived Empire's minority shareholders. Under the theory of constructive deception, the jury's findings that Moody deceived minority shareholders of Empire [2] constituted findings that Moody so deceived Empire.

### Purchase or Sale of Securities in Connection With Proscribed Conduct

The second basic element of a 10b–5 action seeks to establish a causal link between the conduct proscribed by rule 10b–5—the intentional deception—and the purchase or sale of a security. In this case that causal link is between Moody's deceptive practices concerning the value of the trust interest and the acquisition program. The acquisition program involved three types of transactions: mergers; outright purchases of shares in other corporations; and purchases of blocks of life insurance policies through bulk reinsurance agreements. (T. 575, 578, 785–88). Each time Empire merged with a corporation it purchased and sold securities. *See Smallwood v. Pearl Brewing Co.,* 489 F.2d 579, 590 (5th Cir. 1974). Empire's outright purchases of shares in other corporations were clearly the purchases of securities. Empire's purchases of blocks of life insurance were not, however, the purchases of securities. The significance of this fact will be explored later. For purposes of this discussion, it need only be stated that the acquisition program involved purchases and sales of securities.

█ The Fifth Circuit has broken down the proof of a causal link between the proscribed conduct and the purchase or sale of a security into the proof of two separate but overlapping elements: (1) actual reliance by the plaintiff upon the defendant's deceptive practices in deciding whether to purchase or sell a security; and (2) deceptive practices by defendant "in connection with" plaintiff's purchase or sale of securities. *See Rifkin v. Crow,* 574 F.2d 256 (5th Cir. 1978); *Moody, supra; First Virginia*

*Bankshares v. Benson,* 559 F.2d 1307 (5th Cir. 1977); *Dupuy v. Dupuy,* 551 F.2d 1005 (5th Cir. 1977). The existence of a separate reliance element raises a question whether Receiver may recover judgment on his 10b–5 claim if the jury did not expressly find that Empire's shareholders relied upon Moody's deceptions concerning the value of the trust interest in assessing the propriety of the acquisition program. It is presumed that Empire's shareholders relied upon Moody's omission concerning the transferability of the trust interest. *See Rifkin, supra,* 574 F.2d at 262. Since the court instructed the jury that it should find "a device, scheme, or artifice to defraud" only if the device, scheme or artifice to defraud operated to deceive "persons who would predictably rely thereon," the jury's answer to Question No. 6 conceivably encompasses a finding of actual reliance upon Moody's affirmative misrepresentation concerning the value of the trust interest. Even assuming the jury's answers to Questions No. 6, 7, and 8 do not include a finding of actual reliance, however, its answer to Question No. 9 necessarily involves a finding of actual reliance on Moody's misrepresentation. The jury could not have found that Moody's securities violations proximately caused damages to Empire without finding that Empire's shareholders actually relied upon those violations. *See Rifkin, supra,* 574 F.2d at 262 (reliance requirement "simply requires there to be a causal link between defendant's violation and plaintiff's harm in order for plaintiff to recover"). Whereas a finding of reliance does not necessitate a finding of causation, *see Moody, supra,* the converse is not true. If there is evidence to support the jury's finding of proximate cause, the element of reliance has been satisfied.

The jury's proximate cause finding also obviates the need for a separate finding that Moody's securities violations were "in connection with" the purchase or sale of a security. The Fifth Circuit may give "in

---

**2.** Although Moody originally owned 100% of Empire's stock (T. 579, DX 43), various mergers created minority shareholders in Empire prior to the deceptions practiced in the 1965 annual report in connection with the increase in value of Moody's trust interest.

connection with" a loose causal interpretation. In *First Virginia Bankshares, supra,* the court quoted the following formulation of the "in connection with" requirement from *List v. Fashion Park, Inc.,* 340 F.2d 457 (2d Cir. 1964): "whether the plaintiff would have been influenced to act differently than he did act if the defendant had disclosed to him the undisclosed fact." 559 F.2d at 1315. *See Wilson v. First Houston Investment Corp.,* 566 F.2d 1235, 1243 (5th Cir. 1978) (any purchase and sale of security "too remote" to satisfy "in connection with" requirement). *But see Superintendent of Insurance, supra,* 407 U.S. at 12–13, 92 S.Ct. 165 (corporation which suffers an injury as a result of deceptive practices "touching" its sale of securities entitled to recover under Rule 10b–5). *See generally* Note, *The Pendulum Swings Farther: The "In Connection With" Requirement and Pretrial Dismissals of Rule 10b–5 Private Claims for Damages,* 56 Texas L.Rev. 62 (1977). One commentator construes *Santa Fe, supra* 430 U.S. at 474 n. 14, 97 S.Ct. 1292, 51 L.Ed.2d 480, as requiring, in the context of 10b–5 suits premised on "constructive deception" of shareholders, a causal link between the deception and the challenged securities transactions. Note, 91 Harv.L.Rev. 1874 (1978). This link is satisfied, the commentator argues, if the deception practiced by corporate directors upon shareholders precludes a shareholder's derivative suit to enjoin the securities transactions, regardless of whether such a suit would succeed. *See Goldberg, supra.* Although the definition of "in connection with" is in flux, one can safely assume that it does not entail a degree of causation more rigorous than proximate causation. *Cf. First Virginia Bankshares,* 559 F.2d at 1314 n. 4. A priori, the "in connection with" requirement is met if there is evidence to support the jury's answer to Question No. 9.

◼ The court is of the opinion that the jury had before it adequate evidence upon which to base its finding of proximate causation. The jury could readily find that the deceptive description of the Moody trust interest in Empire's Annual Report of 1965 had considerable impact upon Empire's mi-

nority shareholders. *See Rifkin, supra,* 574 F.2d at 261 n. 1. It could conclude that, had shareholders known of the shaky foundation upon which the increase in the value of the trust interest rested, they would have taken steps to halt the acquisition program. (T. 542–43). Since Moody could not have implemented the acquisition program but for the increase in value of the trust interest, shareholders could have halted the program by publicizing the facts surrounding the increase in value. The jury could reasonably conclude that dissemination of these facts to companies targeted by Empire for merger and to persons approached for non-cash sales of controlling shares in corporations would foil such transactions and lead to the abandonment of the whole acquisition program. The jury could also have found that shareholders could have halted the acquisition program through a court injunction based on the same mismanagement and breach of fiduciary duty claims brought by the Receiver and decided by the jury that very day. *See Goldberg, supra.* There being adequate evidence to support the jury's finding that Moody's securities law violations proximately caused the acquisition program, the second basic element of Receiver's Rule 10b–5 action has been established.

### Due Diligence

◼ The Fifth Circuit requires that a plaintiff seeking recovery under Rule 10b–5 prove his "due diligence" as an element distinct from the actual reliance requirement. *Dupuy, supra; Clement A. Evans & Co. v. McAlpine,* 434 F.2d 100 (5th Cir. 1970). Under *McAlpine,* a plaintiff established his due diligence by proving that his reliance upon defendant's deceptive practices was reasonable under all the circumstances existing at the time of the deceptive practices. 434 F.2d at 103–04. *Dupuy,* a decision handed down after this case was submitted to the jury, announced a less stringent due diligence requirement responsive to the Supreme Court's holding in *Ernst & Ernst, supra.* Under *Dupuy* a plaintiff did not exercise due diligence if he

intentionally refused to investigate in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow. 551 F.2d at 1020.

■ Moody contends in his Memorandum of Law at p. 47 that Receiver may not recover on his 10b–5 claim because the jury did not make a finding of due diligence. The jury's finding in response to Question No. 14, although in the context of Moody's statute of limitations defense, would seem to establish Empire's due diligence under *Dupuy.* The jury found that Empire's shareholders other than Moody did not have knowledge of facts that would have caused a reasonably prudent person to make inquiry which would have led to a discovery before March 21, 1969, of the material circumstances surrounding the increase in carrying value of the trust interest and the acquisition program. To make this finding, the jury must have concluded that Empire's minority shareholders did not intentionally refuse to investigate a known or obvious risk concerning the value of the trust interest so great as to make it highly probable that harm would follow. Since, however, Moody had the burden of proving the shareholders' unreasonable delay in discovering Receivers' claims in Question No. 14, and Receiver would have the burden of proving due diligence, the jury's answer to Question No. 14 may not discharge Receiver's duty to establish due diligence.

■ The jury's failure to make a finding of due diligence, however, does not necessitate a new trial. Moody did not request an interrogatory or instruction to the jury concerning Empire's shareholders' due diligence in assessing the value of the trust interest and did not object to the omission from the charge of the issue of due diligence.[3] Under these circumstances F.R. Civ.P. 49(a) authorizes the court to make a finding on the issue of due diligence. Accordingly, the court finds that Empire's minority shareholders did not intentionally refuse to investigate a known or obvious risk concerning the value of the trust interest so great as to make it highly probable that harm would follow.

*Resultant Damages to the Plaintiff*

The third basic element of a 10b–5 action concerns the causal link between the securities transactions caused by the defendant's proscribed conduct and the loss suffered by the plaintiff. *But see Moody, supra* (under one interpretation causal link between deceptive practice and loss is required; even though defendant's misrepresentation induced plaintiff to purchase a security—a discretionary account in commodities futures contracts—defendant not liable for losses incurred in trading of particular futures because plaintiff consented to such trading). The jury's answers to Question No. 9 and 10, adequately supported by the evidence, establish a causal link between Moody's deceptive practices and Empire's loss. In meeting the more stringent causation requirement that is one interpretation of *Moody*,[4] this jury finding establishes a causal link between the acquisition program and Empire's loss, thus satisfying the third basic element of a 10b–5 claim.

In the previous section the court upheld the jury's finding of $5,000,000 compensatory damages based upon evidence that the

---

**3.** At the time of this case, *McAlpine* had clearly established a due diligence requirement. That *Dupuy* altered the content of the requirement did not relieve Moody of the duty to object to the omission of the issue from the Charge if he wished to preserve his right to a jury determination.

**4.** *Moody,* 570 F.2d at 572 n. 7 expressly denies that it is requiring anything more than proof of "transaction causation": a causal link between the defendant's deceptive practices and plaintiff's securities transactions. One possible interpretation of the court's decision which conforms with this denial is that, since the plaintiff consented to the trading of those futures which resulted in his loss, he would have entered into those transactions regardless of whether he had "purchased" the discretionary commodities account from the defendant. A third interpretation of *Moody* is that at the time of the futures trading which caused plaintiffs' losses defendant's misrepresentation was no longer material. 570 F.2d at 528.

acquisition program caused damages amounting to at least that much. Having found that Moody breached common law duties owed to the corporation by implementing the acquisition program, the jury reasonably considered the loss attributable to the acquisition program in calculating the damages recoverable on Receiver's common law claims. It is more problematic, however, to permit the jury's finding of damages recoverable on Receiver's securities law claims to stand if premised also on the loss to Empire caused by the acquisition program. Moody violated the securities laws only in connection with transactions in the acquisition program which were purchases or sales of securities. He did not violate the securities laws when Empire purchased blocks of life insurance from other companies. If the jury considered the whole acquisition program in determining the damages caused by Moody's securities law violations, it took into account losses caused by transactions other than purchases or sales of securities. The court must determine, first, whether the jury did consider the purchases of blocks of life insurance in assessing damages for Moody's securities law violations and, if so, second, whether the jury erred in considering those transactions.

The court instructed the jury that the bulk insurance transactions were not securities transactions. Charge at 20. It did not, however, instruct the jury that it was not to take the bulk insurance transactions into account in assessing damages for Moody's securities law violations. Rather, the court stated the Receiver's contention in connection with his 10b–5 claim that the acquisition program embarked upon by Moody was the proximate cause of the ultimate damage to Empire Charge at 18. It is doubtful that the jury found identical damages for Moody's breach of common law duties and for his securities law violations and omitted consideration of the bulk insurance transactions in assessing damages on the securities law claims. As no evidence was introduced to show the loss to Empire caused by the acquisition program less the bulk insurance transactions, it is even more unlikely that the jury made such a finding in response to Question No. 10.

The court is of the opinion that the jury did not err in taking into account the bulk insurance transactions in assessing damages for Moody's securities law violations. The jury could reasonably have determined that Moody would not have engaged in the acquisition program at all if he had been unable to enter into the securities transactions forming the basis for Receiver's 10b–5 claims. Thus it could have found that Moody's securities law violations caused the entire acquisition program which caused a loss to Empire of $5,000,000. Even if the securities law violations did not cause the bulk insurance transactions, the jury was entitled to consider those transactions in determining damages on Receiver's 10b–5 claims. As discussed above, the transactions constituting the acquisition program are inextricably bound with reference to Empire's loss. No one kind of transaction caused Empire's loss. To require proof that the securities transactions alone caused Empire's loss and proof of the extent of that loss would foreclose Receiver's 10b–5 claims. It should be Moody's burden to prove what amount of Empire's loss, if any, is not attributable to his violations of Rule 10b–5. *See Daniels Towing Service, supra.* Since Moody presented no such evidence in mitigation of Empire's loss, the jury was entitled to charge him with the loss attributable to the entire acquisition program.

For the reasons set forth above, the court is of the opinion that the jury's findings support the entry of judgment on Receiver's 10b–5 claims in the amount of $5,000,000.

## III. *Estoppel*

Citing *Bangor Punta Operations, Inc. v. Bangor and Aroostock R.R.*, 417 U.S. 703, 94 S.Ct. 2578, 41 L.Ed.2d 418 (1974), Moody contends that Receiver is equitably estopped from bringing this suit on behalf of Empire because the proceeds of the suit will go to Protective under the Fourth Amend-

ment to Treaty of Assumption and Bulk Reinsurance (Treaty), PX 73. The decision in *Bangor Punta* turned on the equitable principle that a purchaser of all, or nearly all, of a corporation's shares may not sue his seller for corporate mismanagement. 417 U.S. at 425, 94 S.Ct. 2578. If permitted to recover from his seller, the purchaser would obtain a windfall, assuming he paid the fair market value of the shares, and would, in effect, recover his purchase price from the seller. 417 U.S. at 425–26, 94 S.Ct. 2578. Finally, recovery would permit the buyer to profit from the wrongs done to others and thus would encourage further such speculation. *Id.*

■ *Bangor Punta* does not compel dismissal of this suit on its facts or on its principles. Protective did not purchase any shares of Empire. Rather, it acquired most of Empire's assets and liabilities under a bulk reinsurance agreement after Empire had been adjudicated insolvent and placed in receivership. The assets transferred to Protective expressly did not include the causes of action sued upon in this case. Since Protective acquired an insolvent company, it required a moratorium on the cash values of insurance policies issued by Empire. The proceeds of this suit will be received by Protective and applied to reduce the Moratorium Amount established in the bulk reinsurance agreement. Treaty at 2. They will not be a windfall for Protective. Protective will not thereby recover the "purchase price" of Empire. Finally, it will not profit from wrongs done to others. It flies in the face of equity for Moody to argue that he may avoid compensating Empire for the loss he caused it because the Receiver has chosen to benefit the creditors of Empire with the proceeds of this suit.

### IV. *McCarran-Ferguson Act*

■ Moody contends that the McCarran-Ferguson Act, 15 U.S.C. § 1012(b) forbids Receiver's 10b–5 claims because they involve the construction of an Act of Congress that would "invalidate, impair or supercede" Alabama law regulating the accounting of insurance companies and

hence the "business of insurance." Even assuming that the Alabama law which regulates the accounting of insurance companies concerns the "business of insurance" because it is designed to protect the security of policyholders, *see SEC v. National Securities, Inc.*, 393 U.S. 453, 461–62, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969), Receiver's suit under the Securities Exchange Act of 1934 does not "invalidate, impair, or supercede" such law. In *National Securities, supra*, the Supreme Court held that the state law under which an insurance commissioner approved a merger between two insurance companies was not impaired by a SEC action to enjoin the merger. According to the Court, the insurance commissioner viewed the merger from the standpoint of its impact on policyholders and the SEC sought to protect the shareholders of the companies from misrepresentations made in connection with the merger. Since the Court had determined that shareholder protection did not involve the business of insurance, it concluded that the SEC's suit would not impair the law under which the insurance commissioner approved the merger, even though, if successful, it would undo the merger.

In this case, the Receiver's suit seeks recovery for losses caused by securities transactions entered into as a result of Moody's deceptive practices in connection with the valuation of the trust interest. Empire's purchases of securities were not the "business of insurance" because they did not directly involve the relationship between the insurance company and its policyholders. *See Group Life & Health Insurance Co. v. Royal Drug Co.*, 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 257 (1979); *National Securities, supra*. Unlike the facts of *National Securities*, recovery by Receiver on his 10b–5 claim would not even have required that the Alabama Insurance Commissioner revise the value at which Empire holds Moody's trust interest. Federal securities law merely required full disclosure of the facts surrounding the valuation of the trust interest for the benefit of the corporation's investment decisions. It did not impair the Alabama Insurance Commissioner's

valuation of Empire's assets in accordance with statutory accounting principles for the benefit of Empire's policyholders. As in *National Securities, supra*, 393 U.S. at 463, 89 S.Ct. 564, there was no conflict.

### V. *Other Grounds of Error*

Several grounds of error asserted by Moody have already been considered by the court and do not require reconsideration. The remaining grounds can be quickly disposed of.

The court is of the opinion that sufficient evidence supports the jury's findings in response to Questions No. 14–17. The evidence also adequately demonstrates Moody's responsibility for the liability producing acts found by the jury. The forms of the interrogatories submitted to the jury are not confusing or misleading. The jury did not award punitive damages for Moody's securities law violations. Rather, its award of $1,000,000 punitive damages in response to Question No. 12 is tied to its finding of Moody's breach of common law duties in Question No. 3. The court did not submit a damage issue to the jury with respect to Question No. 4 because the damages suffered by Empire as a result of Moody's self-dealing did not present an issue of fact. The evidence shows that, as a result of Moody's self-dealing, Empire transferred on July 1, 1971, over $319,000 to W. C. Moody Bankers (PX 70) and received nothing in return. All other grounds of error raised by Moody are overruled.

### VI. *Conclusion*

In accordance with the jury's verdict the court shall enter judgment on Receiver's self-dealing claim in the amount of $319,-000. It shall also enter judgment on his mismanagement and breach of fiduciary duty claims and on his 10b–5 claims in the amount of $5,000,000. Further, the court shall enter judgment for punitive damages on Receiver's mismanagement and breach of fiduciary duty claims in the amount of $1,000,000. Under Texas law, the court is required to award pre-judgment interest as damages on Receiver's common law claims if the principal damages are determinable and established at a definite time either by

rules of evidence or known standards of value. *McDaniel v. Tucker*, 520 S.W.2d 543, 549 (Tex.Civ.App.—Corpus Christi 1975, *no writ*); *Colonial Refrigerated Transportation, Inc. v. Mitchell*, 403 F.2d 541, 554 (5th Cir. 1968). *But see Phillips Petroleum Co. v. Adams*, 513 F.2d 355, 366 (5th Cir.) *cert. denied*, 423 U.S. 930, 96 S.Ct. 281, 46 L.Ed.2d 259 (1975). The damage to Empire caused by Moody's self-dealing became definite and ascertainable on July 15, 1971, when Empire funds were transferred to W. L. Moody Bankers. The damages suffered by Empire as a result of Moody's mismanagement and breach of fiduciary duty became definite and ascertainable as of the date of receivership, July 1, 1972. Accordingly, the court shall award pre-judgment interest on Receiver's common law claims from these dates. One question remains: at what rate of interest shall prejudgment interest be awarded?

Unfortunately, the Texas law is not clear. *Watkins v. Junker*, 90 Tex. 584, 40 S.W. 11 (1897) stated that "the courts have, by analogy, adopted the legal rate of interest fixed by statute as the standard by which to be governed in assessing damages for the detention of money." Texas law provides for two legal rates of interest. Tex.Rev.Civ. Stat.Ann., art. 5069–1.03 allows pre-judgment interest on "written contracts ascertaining the sum payable" and on open accounts at the rate of six per cent. Since September 1, 1975, Tex.Rev.Civ.Stat.Ann., art. 5069–1.05 has provided for post-judgment interest at the rate of nine per cent. In a Memorandum Opinion and Order entered November 29, 1978, in *Hadra v. Herman Blum Consulting Engineers*, CA–3–75–1041–D, 74 F.R.D. 113, this court determined that pre-judgment interest as damages should be awarded at a rate of six per cent. A review of the case law revealed no discussion of the issue of which rate to apply, but uncovered applications of both the nine per cent and the six per cent rates. *See Earl Hayes Rents Cars & Trucks v. City of Houston*, 557 S.W.2d 316, 322 (Tex.Civ. App.—Houston [1st Dist.] 1977, writ ref'd n. r. e.); *City of Ingleside v. Stewart*, 554

S.W.2d 939, 946–47 (Tex.Civ.App.—Corpus Christi 1977, writ ref'd n. r. e.). Resorting to the language of *Watkins*, this court concluded that art. 5069–1.03 provided the more appropriate analogy for pre-judgment interest as damages because it provides specifically for pre-judgment interest. Furthermore, to award pre-judgment interest as damages at a rate of nine per cent would emasculate art. 5069–1.03. As stated in *Hadra, supra*, the court feels bound to apply a six per cent rate to pre-judgment interest awarded as damages until the Texas legislature remedies the disparity in legal rates of interest or the Texas courts resolve the issue of which rate to apply.

The court is not bound by state law in determining whether to award pre-judgment interest on Receiver's securities law claims. Whether to award pre-judgment interest is a question of fairness resting within the district court's sound discretion, *Wolf v. Frank*, 477 F.2d 467, 479 (5th Cir. 1973). Under the circumstances of this case, the court is of the opinion that Receiver should be awarded pre-judgment interest at the rate of six per cent from the date of receivership, July 1, 1972. Moody's personal wrongdoing was established by the jury's findings. *See Norte & Co. v. Huffines*, 416 F.2d 1189, 1191–92 (2d Cir. 1969). Further, Empire was deprived of the opportunity to invest the $5,000,000 awarded by the jury as damages. *Id.* at 1192. Finally, Moody is at least as responsible as Receiver for the time elapsed in bringing this suit to judgment. *Id.* Moody's voluminous post trial briefs attest to that.

Defendant's motions are denied; it is so ORDERED.